# Exhibit A

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CHELAN

------------------------------------------------------------

JOSE QUEZADA,                          )
                                       )
                Plaintiff,             )
                                       )
       vs.                             ) No. 16-2-00055-4
                                       )
CITY OF ENTIAT,                        )
                                       )
                Defendant.             )
                                       )
------------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

CAROL ANN McLESTER

------------------------------------------------------------

Date:          March 14, 2017

Location:      Lacy Kane, P.S.
               300 Eastmont Avenue
               East Wenatchee, Washington  98802

Start Time:    10:22 a.m.
End Time:      11:02 a.m.

REPORTED BY:   CHARLENE M. BECK, CCR, RPR
               CCR # 2543

1

APPEARANCES:

For the Plaintiff(s):          MR. COREY M. KANE
                               Lacy Kane, P.S.
                               Attorneys at Law
                               300 Eastmont Avenue
                               P.O. Box 7132
                               East Wenatchee, WA   98802
                               509.884.9541


For the Defendant(s):          MR. JAMES BAKER
                               Jerry J. Moberg & Associates
                               Attorneys at Law
                               124 3rd Avenue S.W.
                               Ephrata, WA   98823
                               509.754.2027


ALSO PRESENT:                  MR. JOSE QUEZADA

**2**

planner/Administrator, under that position did she directly supervise Jose?

A    Clarification on that.  I mean, she was -- she was over Mike Herdt who was Jose's supervisor.

Q    Did Susan work with Jose on a daily basis?

A    No.

Q    Did Mike Herdt work with Jose on a daily basis?

A    My opinion is yes.  But I'm not out in the field, so I don't know if he was down there every day talking to him or whatever.  My opinion would be yes, but I don't know that for a fact.

Q    So Jose's job was in the field?

A    Yes.

Q    Did Susan ever talk to you about terminating Jose?

A    She made a comment.

Q    What comment did she make?

A    She says, "I don't like that kid.  I need to find a way to fire him."

Q    Did she -- why didn't she like him?

A    I have no idea.

Q    Why did she want to find a way to fire him?

A    I don't know.

Q    Did she ever make any other similar comments to you about Jose?

A    No.  Just actions.

8

CAROL ANN McLESTER

Q   And you said "actions".  What actions are you referring to?

MR. BAKER:  Um --

THE WITNESS:  (Indicating.)

MR. BAKER:  Go ahead and finish your question (sic).

I want to take a break.

MR. KANE:  Okay.

Q   (By Mr. Kane) No.  You can finish answering the question.  That's fine.

MR. BAKER:  Well, I want to take a break anyway.

MR. KANE:  We'll take a break after.

MR. BAKER:  No, she doesn't have to.  That's -- that's a rule a lot of people say, but that isn't a rule.

I want to talk to you for a minute.

(RECESS TAKEN.)

MR. KANE:  Back on the record.

Q   (By Mr. Kane) And I just asked you a question and your attorney requested that you not answer the question but to speak with him in the hall before answering.

MR. KANE:  Could you read back the question

**9**

Q    Did you say Jose was terminated from the City of Entiat?

MR. BAKER:  What's the question again?

Q    Was Jose terminated from the City of Entiat?

A    I never did see the letter that was apparently given out at the staff meeting.  I heard that the -- it said the position had been closed, so...

Q    Did Susan ever try to terminate Jose before the closing of his position?

A    Not to my knowledge.

Q    Is there currently a park supervisor position at Entiat, the City of Entiat?

A    No.

Q    Is there a position that is essentially the same position but with a different job title?

A    Not that I know of.  That would just be my opinion, so...

Q    Why was Mr. Quezada's position eliminated?

A    That I don't know for sure.  I was just told that they didn't need a park supervisor.

Q    Do you believe that it was eliminated in order to get rid of Jose?

MR. BAKER:  I'll object to the form of the question and speculation and...

You can try to answer it.

**15**

CAROL ANN McLESTER

But the objection should be noted.

Q   You can answer.

A   That would just be my opinion.

Q   What is that opinion based upon?

MR. BAKER:  Wait a minute.  I -- did -- did she give an opinion?  I didn't hear her give an opinion.  Did she give an opinion?

MR. KANE:  I believe "That would just be my opinion" was an affirmative answer.

MR. BAKER:  No.  I -- I -- I didn't hear it that way.

MR. KANE:  Okay.

Q   (By Mr. Kane) So when you say (as quoted):  "That was just my opinion", are you saying yes, that you believe the position was eliminated in order to get rid of Jose?  Is that correct?

MR. BAKER:  If you know.

A   I don't know anything for sure.  It's just my opinion.

Q   And what is that opinion based upon?

A   What I saw take place.

Q   And specifically what are you referring to that took place?

A   Phone calls and a statement.

Q   Is it the phone calls and statement that we previously discussed?

**16**

CAROL ANN McLESTER

A    Yes.

Q    Is there anything else that would make you think that?

A    No.

Q    We touched on it briefly, but have any positions been created at the City of Entiat since the time that Jose's position was eliminated?

A    The field supervisor.

Q    And who did you say works in that position?

A    Jim Brooks/code enforcer.

Q    And you said that you're not aware of what that job description actually entails, though?

A    I've been told that he -- the field supervisor is over the other workers, the utility/maintenance people.

Q    Okay.  And how long ago did you say he was hired?

A    November.  He was hired as a code enforcement officer first.  And then the field supervisor, I believe, came after the first of the year.

Q    Do Entiat employees begin work under a probationary period?

A    Yes.

Q    How long is that probationary period?

A    My understanding is six months.

Q    Do you know if Jose's probationary period was ever extended?

A    I do not know that.

**17**

Q   Are you aware of any performance issues that Jose had while working for the City of Entiat?

A   Not firsthand, no.  No.

Q   Were the only performance issues that you heard of the ones that you heard from Pam who had spoke to Mark?

A   Correct.

Q   Do you know if Jose was ever disciplined?

A   No, I do not know.

Q   Did you ever work with a Martin Thacker?

A   Yes.  He works for the City.

Q   Is he currently working for the City of Entiat?

A   Yes.

Q   What is his position?

A   Waste treatment plant operator.

Q   Does he work full time?

A   Yes.

Q   Do you know whose idea it was to eliminate the park supervisor position?

A   Susan Driver's.

Q   Did Susan Driver ever indicate to you that she did not like Jose because he's Hispanic?

A   No.

Q   Do you remember the interview process for Jose?

A   No, I do not.

Q   Are you a part of any interview --

**18**

CAROL ANN McLESTER

23, 24 years.

Q   How long has Pam worked for the City?

A   It was two years in December.

Q   So did Mark get her a job there?

A   She went through an interview process.

Q   Were they married at the time she was hired?

A   No.

Q   Were they dating at the time she was hired?

A   No.

Q   They started dating after she was hired?

A   Yes.

Q   And were they dating at the time Jose worked there?

A   Yes.

Q   Do you ever use your cell phone at work?

A   Yes.

Q   Has it ever been an issue?

A   No.

Q   Have you ever seen other employees use their cell phones while working?

A   Yes.

Q   Has it ever been an issue for any of them?

A   No.

Q   It seemed like you wanted to say something a few times earlier that you felt hesitant to say.  Is there any facts relevant to Jose's termination that we haven't

20

CAROL ANN McLESTER

discussed that you can present?

MR. BAKER:  Object to the form of the question.  She's here to answer specific questions from you, not for you to -- for her to give a lecture.

Q  You can answer.

MR. BAKER:  No, she -- there's no question. You need to ask her specific questions.

MR. KANE:  It's broad, but it doesn't fall under any privilege.  It's -- I mean, broad questions can have specific answers.

MR. BAKER:  Okay.  Try your question again.

MR. KANE:  Can you repeat the question?

(PRIOR QUESTION READ.)

MR. BAKER:  I think the same objection. You're asking her -- I mean, you're asking her:  "Is there anything more you want to say about Jose Quezada?"  Is that the question?

MR. KANE:  Facts relevant to his termination.

MR. BAKER:  Well, then why don't you -- I think she needs specific questions.

Q  (By Mr. Kane) Do you understand that question?

A  (No response.)

Q  Do you understand the question I asked you?

21

CAROL ANN McLESTER

A   Yes.

Q   Do you think you can provide an accurate answer to that question?

        MR. BAKER:  What?  The question is:  "Is there anything more about Jose Quezada that you would like to discuss?"  Is that the question?

        MR. KANE:  No.  The question's on the record.

        MR. BAKER:  Okay.  You say that she was hesitant sometimes.  I mean --

        MR. KANE:  That wasn't the question.

        MR. BAKER:   -- is that -- is that --

Q   (By Mr. Kane) Did you understand the question I asked you?

A   Yes.

Q   Could you please answer it.

        MR. BAKER:  If you understand the ques-- if you think you understand the question, it's -- answer it, yeah.

    I mean, could we just have the -- let's have it -- to make it clear, let's have the question again.


        (PRIOR QUESTION READ.)


Q   And your answer was "Yes."  And I'm now asking you:

**22**

what are those facts?

MR. BAKER:  Go ahead and try, if you can answer that question.

A    When I found out that Jose had been terminated, I went to his immediate supervisor, Michael Herdt, and asked him, and he told me, he said, "I wish I had five workers like Jose."

Q    Anything else?

A    No.

Q    I don't have any other questions.

MR. BAKER:  I have no questions.

(PROCEEDING CONCLUDED AT 11:02 A.M.)

23

CAROL ANN McLESTER

REPORTER'S CERTIFICATE
DEPOSITION OF CAROL ANN MCLESTER

I, CHARLENE M. BECK, Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 11th day of April, 2017.

_____
CHARLENE M. BECK, CCR, RPR
CCR # 2543
Notary Public in and for the
State of Washington, residing
at Wenatchee.

My commission expires on July 19, 2019.

25

# Exhibit B

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CHELAN

-----------------------------------------------------------

JOSE QUEZADA,                          )
                                       )
                    Plaintiff,         )
                                       )
         vs.                           ) No. 16-2-00055-4
                                       )
CITY OF ENTIAT,                        )
                                       )
                    Defendant.         )
                                       )
-----------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

KEITH W. VRADENBURG

-----------------------------------------------------------

Date:            March 14, 2017

Location:        Lacy Kane, P.S.
                 300 Eastmont Avenue
                 East Wenatchee, Washington  98802

Start Time:      8:58  a.m.
End Time:        10:03 a.m.

REPORTED BY:     CHARLENE M. BECK, CCR, RPR
                 CCR # 2543

1

APPEARANCES:

For the Plaintiff(s):       MR. COREY M. KANE
                            Lacy Kane, P.S.
                            Attorneys at Law
                            300 Eastmont Avenue
                            P.O. Box 7132
                            East Wenatchee, WA  98802
                            509.884.9541


For the Defendant(s):       MR. JAMES BAKER
                            Jerry J. Moberg & Associates
                            Attorneys at Law
                            124 3rd Avenue S.W.
                            Ephrata, WA  98823
                            509.754.2027



ALSO PRESENT:               MR. JOSE QUEZADA

**2**

A    Yes.

Q    Do you have any children?

A    Two.

Q    How old are they now?

A    Huh, that's a bad question.  50 and 47.

Q    Are you currently employed?

A    I am a part-time mayor, yes.

Q    Is that for the City of Entiat?

A    Yes.

Q    Is there a full-time mayor?

A    No.

Q    You're --

A    I am the only mayor.

Q    -- the only mayor.  How long have you been mayor for the City of Entiat?

A    Nine years, three months.

Q    And could you describe for me your job duties as mayor of the City of Entiat?

A    I'm the top administrator as the mayor.  We don't have an administrative assistant now, which would have been the City Administrator does all that.  But I'm doing that now.

Q    Is there a reason you no longer have a City Administrator?

A    I don't think so.  I'm not exactly sure how to answer

**6**

ask Linda Countryman. But it might have been Ron Hupp, because he was -- it was about that time we let him go too, so...

Q    Is the ultimate decision on hiring anyone who works for the City yours?

A    As a City Administrator, that -- that would be their task, hiring and firing. My task now is I'm City Administrator now again, so that would be my task now.

Q    So who actually chose Jose for the position?

A    Our comm-- our whole committee picked him and recommended him as the number one. So the actual hiring was done by Susan Driver, I believe.

Q    But the picking was by the committee?

A    Right.

Q    Was Susan Driver on the committee?

A    Yes.

Q    Okay. Do you remember where Jose worked before he worked for the City of Entiat?

A    He was working at Alcoa. And I believe he -- and I know his history. I've known Jose for a long time. And he was on the hotshot crews. But I -- I think he went to Alcoa at the time.

Q    Did he leave that position to work for Entiat?

A    I would assume so, yes.

Q    Did you ever say anything to Jose about how long his

**11**

KEITH W. VRADENBURG

employment with Entiat would last?

A  I was kind of in the loop.  I talked to Jose.  We talked about how I would like him to get his certifications, you know, water and sewer; make himself more valuable to the City; and we needed those certifications.

Q  Did he ever get those certifications?

A  No, not while -- he would have had to start working on them.  It takes about a year plus to get the water and a year and a half to two to get the sewer certifications.

Q  So on hiring him was it planned that he would get water and sewer certifications?

A  Yes.

Q  And how long was he employed with Entiat then?

A  Slightly less than six months.  I'm not actually sure of the entire length, but it was just short of six months.

Q  Given that it takes -- you said for the sewer it takes how long to get the certification?

A  Sewer would be two years.  We always try to start them on water first.  Sewer (sic) takes about a year.  It depends on how fast they want to work.  But we always try to allow a year to give them enough ample time for the testing and the classes and...

**12**

KEITH W. VRADENBURG

Q   So when he was hired it was assumed he would be there at least a couple years?

A   Well, when he was hired the deal was that he would start working on sewer and water.  And -- and I think he was aware of that.  We told him that was my plan.  Although, I wasn't the City Administrator, but that's what I wanted.

Q   Was he ever told that his position there would be permanent?

A   I -- you know, that's -- I don't know.

Q   Okay.  Was he ever led to believe that it would be permanent?

        MR. BAKER:  Object to the form of the question.

A   Not from me because I wasn't the City Administrator at the time.

Q   Do you know if he was by anyone else?

A   I can't -- no, I don't know.

Q   When he was hired did the City of Entiat run a background check on him?

A   We always do, yes, every employee.

Q   Do you know if anything showed up on Jose's background check?

A   Minor things.  Nothing I was concerned with.

Q   Do you remember what those things were?

**13**

KEITH W. VRADENBURG

A    Not off the top of my head, no.  But it wasn't something I was concerned with.  And I think they were quite some time ago, whatever it was.

Q    Okay.  And you may have went over it briefly, but what was Susan Driver's position with the City of Entiat and what did that job description entail?

A    She was the City Administrator.  Originally she was the Planner.  And then council decided to make her the City Administrator.  And so she was basically City Administrator/Planner.  And so she was in charge of the daily operations of the City, which is basically everything; hiring, firing, setting -- you know, talking with the supervisors, which were Mike Herdt and Linda Countryman after a while.

Q    And so Mike Herdt was the Public Works Director?

A    Yes.

Q    And that would be a supervisor?

A    Yes.

Q    What did his job description entail?

A    Public Works is in charge of the basically utilities, water, sewer, streets, maintenance and repair.

Q    And so he was Jose's supervisor?

A    Yes.

Q    Did he ever talk to you about Jose's job performance?

A    No.

**14**

KEITH W. VRADENBURG

Q    Do you know if he ever talked to Susan Driver about Jose's job performance?

A    I don't know, but I assume they must have.  But I don't know.  I can't answer that.

Q    And did Susan Driver directly supervise Mr. Quezada?

A    Well, she's the supervisor of all of them.  So I -- I would say no because she fell under -- he fell under the purview of the Public Works Director.  She was in charge of the Public Works Director.  So inadvertently I guess you could say that or...

Q    Did she work directly with him on a daily basis?

A    I don't think so, no.  You don't have that much time.

Q    Is there a reason then why she would give him employee evaluations?

A    We -- we evaluate all of our employees yearly.  And then also anybody that comes on they have a certain period of time they're probational, and we do an evaluation during that time.

Q    If she gave him an evaluation would anything that she is aware of regarding Jose's work performance be information that she would have had to get from Mike Herdt?

              MR. BAKER:   Object to the form of the question.

A    Yeah, I -- I -- I don't know.  I -- I would have Mike,

**15**

but I can't speak to that one.  But Mike was his supervisor, so a chain of command should be enforced. But I can't answer that.

Q    Okay.  And so what again were Jose's specific job duties?

A    Park supervisor, run -- you know, be in charge of the park, maintenance operations.  It was our first year after the remodel process.  And the PUD was using it as a sense to see if the City could maintain and operate the park for them.  It's a showcase park and they were very critical about things, so we wanted to, you know, do the best we could, which we did well, so...

Q    What is a showcase park?

A    It's the one that they put a lot of money into.  It's the last park they built, so they're -- it's in all their magazines and all their --

Q    Okay.

A    -- publications and PR documents and...

Q    Was Susan Driver involved in any of the jobs that you just described that Jose was responsible for?

A    Well, she was the City Administrator so she was in charge of basically the umbrella of the City, but we had the supervisors in charge of specifics.

Q    Did she actually work in any of those jobs?

**16**

A    No.  Well, not for the City, anyway.

Q    Did she directly supervise Jose in any of those jobs?

A    No.  But, again, you're asking me questions I have no knowledge of, so...

Q    Did Jose have any performance issues while working for the City of Entiat?

A    Not to my knowledge.

Q    Was he ever given any raises?

A    Given raises?

Q    Yes.

A    We give a raise at the end of the probationary period, so I -- I'd have to say no.

Q    Did Susan Driver ever talk to you about terminating Jose?

A    No.  We talked about the -- the position.

Q    Was Jose ever terminated?

A    Well, yes, I'm assuming so.  I mean, he's...

Q    Did Susan ever try to terminate him before his formal termination?

A    I can't answer that.  I don't know.

Q    Did she ever talk to you that she disapproved of him working for the City of Entiat?

A    Not in that sense, no.

Q    What sense did she talk to you then in?

A    Basically she just talked -- we talked about the

17

A  You're on a pedestal up there and everybody shoots at you kind of.  Anything that happens you're the one that has to, you know...

Q  Uh-huh.

A  So...

Q  And were any staff meetings held regarding the elimination of Jose's position?

A  We have staff meetings about once a quarter.  And we did have -- oh, not as such as eliminating the park -- field supervis-- or park supervisor.  We did have a staff meeting on that, but that was just the supervisors.  And I sat in on that one, so...

Q  And you said Jose worked under a probationary period?

A  Yes.  All of our -- all of our hires are on a probationary period that's set for so long.

Q  Are probationary periods ever extended?

A  As needed.

Q  Was Jose's probationary period ever extended?

A  It was extended to six months so he could work through the summer and not get, you know...

Q  So was it extended to six months from three months?

A  Yes.

Q  Was it extended beyond six months?

A  No.

Q  And why was it extended to six months?

20

not -- I don't remember the hire date, so...

But I knew he was hired before the park was opened.

Q Sir, we'll have to try not to speak at the same time.

A Oh, I'm sorry.

Q No problem. It's understandable.

And so during the second three months the park was open and you could witness him perform his actual job duties; is that --

A Or at least his supervisors could.

Q Okay.

A Because that's not, I don't believe, my task to be a supervisor.

Q Did anyone ever come to you and say they were unhappy with Jose's work performance?

A Not to me.

Q Do you know of anyone -- did you hear that anyone wasn't happy with Jose's work performance?

A I did hear through the grape vine or hear that, yes, Susan wasn't happy with it, but I don't -- that's about all I can say.

Q Do you know why she wasn't happy with it?

A No.

Q Are you aware of any reason as to why she could have been unhappy with it?

22

KEITH W. VRADENBURG

A    I'm not.

Q    Did Mike Herdt, who directly supervised him, ever tell you that he was unhappy with his work performance?

A    No.

Q    Do you know if he was ever unhappy with his work performance?

MR. BAKER:  Object to the form of the question.

A    You'd have to ask Mike on that.  He didn't ever discuss it with me.

Q    Do you know if Jose ever used his cell phone while he was working when he wasn't supposed to?

A    Do I know?

Q    Yes.

A    No.  But, you know, I wasn't his direct supervisor, so I wasn't around all the time.

Q    Is it against the City of Entiat policy to use your cell phone while you're working?

A    While you're driving.  But, I mean, they have breaks and stuff, you know.

Q    Where it's not an issue?

A    Yeah.

Q    I'm just -- I mean, I'm not saying it applies at all, but I'm just saying, like, for example, working here we use our cell phones frequently, and it's not an

**23**

KEITH W. VRADENBURG

issue. It's just common practice now.

Was it common practice for someone to look at or use their cell phone while they were employed at the City of Entiat?

A   Yes.

MR. BAKER: Object to the form of the question.

Q   Did you ever have any concerns that Jose was not working when he was supposed to?

A   One time. I had sat down with Mike and I said, you know, "We need Jose there on the weekends." And there was one weekend it was brought to my attention that Jose wasn't there, but then I had found out later he had -- I don't know if he got it before or after, but Mike had given him the okay. Because he's the supervisor. He sets up the schedules. And -- and my belief is you put good people in like supervisors and they run it. You don't tell them what to do as long as it works. If it doesn't work, then I would change, you know, that position.

Q   So the leave that weekend had been okayed by Jose's supervisor?

A   I think after the fact. But, again, we did discuss it and say that I needed Jose down there on the weekend because that was the time the park's most busy,

**24**

Thursday, Friday, Saturday nights and Sundays.

Q  And what do you mean by "after the fact"?

A  Well, the -- I was told later, you know, not during the time, but I was told then when I talked to Mike that he had said -- he had talked with Jose and was straightening it out and he said that he had given him -- it was okay for him to miss a day or two there.

Q  And you said you --

A  But it wasn't -- that was what I was told.

Q  So did you have any problem with Jose missing that day of work on the weekend?

A  Well, just the fact that I told Mike that he's -- he needed to be there on the weekends.  And that was part of his schedule to schedule him.  As park supervisor you've got to be there at the busiest times.

Q  So was your issue more with Mike or Jose?

A  Probably -- probably with Mike.  He's the supervisor.  And it's his job to regulate and give the daily work schedules and the whole works, schedule.

Q  Did anyone ever call the City of Entiat and complain about Jose?

A  Not to me personally, no.

Q  Did they to any other City of Entiat employee?

A  You'd have to talk to the clerks because they get all the phone calls and route them back to us.  And I'm

work?

A    Well, specific for that I can't answer, but I'm a part-time mayor, but it's becoming a full-time job. But that's because we're growing.

Q    How many hours per week are the seasonal employees given when they're working?

A    40, I think.  I'm pretty sure it's 40.

Q    Do they ever work overtime?

A    They schedule their -- they stagger their schedules so they don't have to work overtime, because that would be another cash problem.

Q    In discovery the City of Entiat identified four -- I believe the four part-time employees that are currently employed.  Is Mark Abhold currently employed with Entiat?

A    Yes.  But he has been there for 20 some years.  He's in the Public Works Department.

Q    Is he Hispanic?

A    No.

Q    Is Martin Thacker currently employed with the City of Entiat?

A    Yes.  He is in charge of now the Sewer Department -- or the -- working in the sewer plant, taking daily tests, water samples.

Q    How long has he worked there?

**28**

KEITH W. VRADENBURG

A    Three years plus some months.

Q    Is he Hispanic?

A    No.

Q    Is Jim Brooks currently employed with Entiat?

A    He just was a -- just hired last fall.

Q    And what does he do?

A    He works in Public Works.  Right now he's just getting ready to take his water test.  I think he may have already taken it.  But he's completed that section.  And -- and I know he's working on sewer too, so...
         But he's a Public Works person, whatever Mike assigns him.

Q    Is he Hispanic?

A    No.

Q    Is Patrick Diehm --

A    Yes.

Q    -- still employed by the City of Entiat?

A    Yes.

Q    What is his --

         MR. BAKER:  What's the last name again?

         MR. KANE:  D-E-I-E-M, Deiem (sic), I think.

         THE WITNESS:  Diehm.

         MR. BAKER:  Diehm.

         THE WITNESS:  Say it fast enough.

A    Yes.  And he's not Hispanic.

**29**

KEITH W. VRADENBURG

Q  (By Mr. Kane) What is his position?

A  He's a -- works in Public Works.  He has a Master Gardener's license.  So he planted the museum in the park.  The park was overplanted and so we needed somebody -- he's gonna start taking -- well, they are right now taking out a lot of the plants.

Q  And did you say how long he's worked at Entiat?

A  Less than a year.  He was hired last spring, April/May.

Q  And who were the part-time employees who worked for the City of Entiat when Jose worked there?  Do you remember their names?

A  Okay.  David Sanford.

Q  Okay.

A  I -- I do not remember all the names, but I --

Q  One would have --

A  -- I --

Q  -- been Mark?

A  Well, Mark was a full-time employee.

Q  Okay.  He's no longer a full-time employee?

A  Mark Abhold?

Q  Yeah.

A  He's still a full-time employee.

Q  Okay.

A  And Martin's a full-time employee.  The part-times are David Sanford.  I'd have to go look at records because

**30**

KEITH W. VRADENBURG

we've had them and then last year and then we're getting new ones this year, so...

Q   You're getting more part-time employees?

A   We'll be hiring four more in May -- or the last week in April/first week in May.  We start advertising the end of this month.

Q   So does that mean the City of Entiat will have a total of eight part-time employees?

A   No.  We only have four during the summer months.

Q   Okay.

A   May till September.  And we plan on hiring two the first couple weeks of May, then adding two more later. Then later towards the end the first two would gravitate out and we'd have the last two towards the middle of September.

Q   Okay.  I guess what I'm missing is if the City of Entiat already has four part-time employees --

A   We have no part-time employees right now.

Q   Okay.  So why aren't you hiring the same four part-time employees back again?

A   Well, some of them are students, college kids and stuff, and they have to apply again or tell us they want to come back.

Q   Okay.

A   And none of them from last year -- two of the people

31

Q   Okay.

A   Not any other positions.  Just that park supervisor.

Q   Okay.  You may have brought it up earlier, but did Susan Driver ever tell you that she wanted to get rid of Jose?

A   No.

Q   Were any special meetings ever held regarding Jose's employment with the City of Entiat?

A   Not with me.  But, again, I wasn't the City Administrator.  So no, I -- I would say -- not with me.  I can answer it that way.

Q   Do you know if they were ever held with anyone else?

A   No.  Remember, I'm -- I'm part time.

Q   Okay.  Was part of the elimination of Jose's position due to the fact that the City of Entiat needed to have two employees that had water certification?

A   Well, we -- we're trying to get all of our employees to get those certifications.  When we'd hired Jose I'd talked to Jose about getting them, and he was very willing to get those certificates.  It was gonna take time and he had to get it into that deal.  And that would have been something that his supervisor, Mike Herdt, would have set up and scheduled, try to get into the classes.  You got to know the dates they start, where they're at.

**33**

Q   Do you know if the process ever began for Jose to get water --

A   No --

Q   -- certification?

A   -- I don't.

(EXHIBIT NUMBER 1 MARKED.)

Q   Are you familiar with the document you've just been handed as Exhibit 1?

A   Yes.  They appear to be the August 13th, 2015, Council Minutes.

Q   I'll give you a minute to review that if you need to.

(PAUSE.)

A   Yeah, they appear to be copies of our minutes.

Q   Referring to paragraph H. under section number 5. it says, "Additional Public Works Staff with water and sewer certifications."

        MR. BAKER:  Which page?

        MR. KANE:  Page 3 of 5.

A   Under H.?

Q   (By Mr. Kane) Yes.

A   It actually starts on page 2?

**34**

KEITH W. VRADENBURG

Q    Yes.

A    Okay.

Q    Number 5., "Additional Public Works Staff with water and sewer certifications", what is that referring to?

A    I believe it's just -- that's referring to the fact that we discussed that we only had currently one person certified.  If that one person was gone, then we had to find somebody.  Like we used Wenatchee as a pretty big cost.  So we have to test the water storage daily.  So our discussions were that we needed to get somebody certified.

Q    And skipping to the paragraph below that on the same page, it says, "In response to a question from Councilmember Anderson, Ms. Driver said the elimination of the Park Supervisor position and fewer seasonal park employees would help fund the additional public works positions."

A    That was her suggestion.

Q    What were the additional Public Works positions that she was suggesting?

A    I would assume any Public Works position.  Although, we never hired anybody.  She was suggesting that we hire somebody that already had the certifications.  But when we advertised we never got any before, the following spr-- or the spring before we never got

35

position?

A     Her suggestion was -- as I -- as I remember it, was to hire a -- a person who had the certifications.  And when we discussed it, we never got an applications before.  And I know the City of Wenatchee and Cashmere were looking for certified people too.  So I just said, "No, we can't afford this, so we're not gonna do that."

She -- she could have been asking for a whole bunch.  I think she was trying to get one that was certified in water and one certified in sewer.  But we didn't have the funds or positions open for any of that, to hire anybody at that time.

Q     Okay.


(EXHIBIT NUMBER 2 MARKED.)


Q     Are you familiar with the document you've been handed as Exhibit 2?

A     Yes.  I believe she handed this out at the council meeting.

Q     And is it normal to hand out Planning Staff Reports at council meetings?

A     Yes.

Q     And --

37

KEITH W. VRADENBURG

A    All of our positions are -- even our part-time employees like our engineer, our business people and our housing person who is part time, gives a report at each council meeting or gives one in writing if they're not present.

I think this basically goes over -- I'd have to read it all -- what we had discussed.

Q    And under the Discussion, at the end of the paragraph it says, "While it is likely that the additional landscaping that will be the City's responsibility next year will require additional help, it is expected that one temporary (May to October) full-time position could cover the overload."

Is that position, is that referring to a position that would be in addition to the four part-time employees that were typically hired?

MR. BAKER:  What paragraph?

MR. KANE:  Under Discussion.

THE WITNESS:  Right here.  This line right here.

MR. BAKER:  Okay.  Thank you.

A    That was her recommendation.  But we used just the four part-time people we had hired.  And they -- they're part-time -- or temporary, but they work 40 hours a week while they were working, so to call them

38

KEITH W. VRADENBURG

a "full-time position temporary" I guess would be correct.

Q  And on the next page it says at the end of the first paragraph "I further recommend that we advertise for a full-time, year-round maintenance position.  Complete water certification should be a requirement to apply for this position so we can fill the gap."

Is that the same position you were referring to earlier that she proposed would be advertised?

A  Yes.

(EXHIBIT NUMBER 3 MARKED.)

Q  Are you familiar with the document you've just been handed as Exhibit 3?

A  I believe this was handed out at a staff meeting.  It was, it says.  Yeah, because I have copies of this too.

Q  I'll give you a minute to review it.

A  It stops.  It says, "This new position", and there should be another.

Q  Maybe I didn't get it all.

A  But anyway, that was handed out at a staff meeting to all the people that were there.  I think our whole staff was there.

39

KEITH W. VRADENBURG

looking.  They were paying a lot more than we could afford and so...

Q   Was the position that she proposed essentially Jose's position with the requirement of water and sewer certifications?

A   That's a hard one for me to answer.  I -- I -- I know she was proposing -- they needed -- she wanted somebody with water certification, period.  I don't know if it was Jose's position or not.

Q   Did the job duties of the new position differ at all -- from the new proposed position differ at all from the position that Jose held?

A   Only the water and sewer certifications would have been different.  It would have required at least four hours a day down in the sewer plant and the water treatment plant.

         MR. KANE:  Could we take a quick break?

         MR. BAKER:  Sure.

         MR. KANE:  Thank you.


         (RECESS TAKEN.)


Q   (By Mr. Kane) I just have a couple more questions.

    Patrick -- now I can't say his name right -- Diehm?

**42**

A    Diehm.

Q    Right.   What was the name of the position that he was hired under?

A    Maintenance worker.

Q    Was he ever any kind of supervisor?

A    No.

Q    Is he certified with water or sewer?

A    Water now.   He's started working on it.   He's working on sewer, but...

Q    Was he certified with water at the time --

A    No.

Q    -- he was hired?

A    We had advertised for somebody certified.

Q    Was Jimmy Brooks certified in water/sewer at the time he was hired?

A    No.

Q    And during the meetings that we spoke of earlier where you described it being discussed that the park supervisor position should be eliminated, were budgetary issues discussed during those meetings?

A    Oh, some.   But basically the position was -- a park supervisor position we didn't need.   I mean, it -- in our plan it didn't -- it didn't -- it wasn't fitting in.

Q    Why was it not fitting in?

**43**

KEITH W. VRADENBURG

## REPORTER'S CERTIFICATE
### DEPOSITION OF KEITH W. VRADENBURG

I, CHARLENE M. BECK, Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 15th day of April, 2017.

_____
CHARLENE M. BECK, CCR, RPR
CCR # 2543
Notary Public in and for the State of Washington, residing at Wenatchee.

My commission expires on July 19, 2019.

**46**

# Exhibit C

SUSAN DRIVER

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CHELAN

JOSE QUEZADA,                        )
                                     )
                Plaintiff,           )
                                     )
                     vs.             )  NO. 16-2-00055-4
                                     )
CITY OF ENTIAT,                      )
                                     )
                Defendant.           )
     -------------------------------------------------

               DEPOSITION UPON ORAL EXAMINATION

                              OF

                        SUSAN DRIVER

       -------------------------------------------------


        Date:            February 6, 2018

        Location:        Lacy, Kane & Kube
                         300 Eastmont Avenue
                         East Wenatchee, WA



        Start Time:      9:00 a.m.

        End Time:        10:33 a.m.


        Reported By:     Alison J. Sosa, CCR
                         CCR # 2575

1

SUSAN DRIVER

APPEARANCES:

For the Plaintiff:          MR. COREY M. KANE
                            Lacy, Kane & Kube
                            Attorneys at Law
                            300 Eastmont
                            East Wenatchee, WA  98802
                            (509) 884-9541
                            (509) 884-4805 FAX
                            corey@lacykane.com


For the Defendant:          MR. JAMES E. BAKER
                            Jerry Moberg & Associates
                            124 3rd Avenue, SW
                            PO BOX 130
                            Ephrata, WA  98823
                            (509) 754-2356
                            (509) 754-4202 FAX
                            jbaker@jmlawps.com
                            mklingenberg@jmlawps.com

Also Present:               MR. JOSE QUEZADA

2

SUSAN DRIVER

I was not being fair to them.

Q  And who were the Public Works staff employees that expressed that to you?

A  That would be Mike Abhold and Martin Thacker.

Q  Any other employees?

A  That thought I was treating him differently?

Q  Yes.

A  No.

Q  Did any City employees ever express to you that they did not think you treated him well?

A  Nope.  Completely the opposite that they expressed to me.

                    (Exhibit No. 1 marked.)

Q  Are you familiar --

                    MR. BAKER:  Do you have the full letter or just the first page?

                    MR. KANE:  It looks like I just actually have the first page.  I think it cut off, whoever copied it, the second page.  But I'm not going to go into the -- what's actually in the letter.

Q  (By Mr. Kane) But do you -- are familiar with the document you've just been handed as Exhibit 1?

A  No, I've not seen this before.  Oh, this is his -- oh, yes, I am.  Okay.  I thought this was related to something else, but I just looked at the date.

Q  Who hired Mr. Quezada at the City of Entiat?

9

SUSAN DRIVER

A    Mike Herdt, H-E-R-D-T.

Q    Whose decision was it to hire Mr. Quezada?

A    Keith Vradenburg.

Q    Did you ever interview Mr. Quezada?

A    Yes.  He was interviewed by a panel.

Q    And you read this letter when he was interviewed?

A    Uh-huh.  Yes.  I'm sorry.

Q    You didn't think that Mr. Quezada wrote it, did you?

A    I did not say that, no.  I actually said, "This is a great letter.  Did you write this?"

Q    So you didn't think he --

A    That would not imply that he didn't write it.  I'm a writing instructor so these things are important to me.

Q    So you didn't think he was capable of writing it?

A    That is not what I said.

Q    Well, you asked him if he wrote it?

A    I said "This is a great letter.  Did you write it?"  A lot of people don't write their own cover letters, just like politicians don't write their own speeches.  He then told me that his wife wrote it.  And I said, "It's great that you have that kind of a team."  I don't think that reflects badly on him at all.

Q    You said -- you made the comment, "I want to get rid of that kid"?

A    I made the comment after he was missing for five hours and

10

SUSAN DRIVER

be at City Hall every morning at 8:00 o'clock, pick them up, and take them down to the park host.

Q   Who informed you of that?

A   The front desk staff who prepared the placards.

Q   Mike Abhold picked them up frequently, didn't he?

A   Sometimes they called him and had him come and get them, yes, because they hadn't been picked up.

Q   Mike Herdt picked them up frequently, didn't he?

A   I don't know.  It's possible.  I'm not aware of that.

Q   Was it even communicated to Mr. Quezada that that was his specific job?

A   I assume it was communicated to him by his supervisor.

Q   But you don't know?

A   I don't -- I didn't know.  I wasn't following him around every day all day.

Q   Is that because you didn't supervise him?

A   It's because I supervised the entire City staff, as well as the budget, and worked with the Planning Commission and the City Council.  No supervisor can be everywhere all the time.

Q   How closely did you monitor Jose's work?

A   About the same as I monitored every employee's work. Typically when concerns were brought to me, they were addressed.

Q   How much contact did you have with him on a daily basis?

A   I don't think I even saw him every day.  His work was

13

SUSAN DRIVER

primarily outside of the office, except for when he came in to pick up materials or we had staff meetings.

Q   But you still gave him performance reviews?

A   Uh-huh.  Yes.  Sorry.

Q   Who was Mr. Quezada's direct supervisor?

A   Mike Herdt.

Q   Mike Herdt would have been in a better position to give Mr. Quezada performance reviews, wouldn't he?

A   He was supposed to do it as well.  Typically before then they had a City Administrator.  The mayor did performance reviews for all employees.

Q   Mike Herdt approved of the work that Mr. Quezada was doing, didn't he?

A   I don't know.  I have heard -- I did hear him complain a few times, particularly about the breakage issues, and a couple of times about not knowing where he was.

Q   Mike Herdt would have been in a better position to give Mr. Quezada a performance review, wouldn't he?

A   I don't think that's relevant because we were both supposed to do it.  So if Mike didn't do it --

Q   Do you know why Mike didn't do it?

A   Mike didn't do a lot of things Mike was supposed to do, like supervise his employees.

Q   Is there any reason you did not terminate him for that?

A   I attempted on two occasions to terminate Mike Herdt, but he

14

SUSAN DRIVER

Q   Says, "Breakage record for three months is unbelievable."
    What was broken?

A   Oh, my gosh.  Truck window, a lawn mower, riding lawn mower.
    I don't know.  I don't have a list with me.

Q   How did the truck window break?

A   I don't know.

Q   How did the riding lawn mower break?

A   I was told it was misused, but I was not there.  I only had
    the report from the supervisor.

Q   Who were you told it was misused by?

A   Mike Herdt.

Q   If you don't know how the truck window was broken, how do you
    know Mr. Quezada broke it?

A   Well, that was about three years ago.  I knew at the time.  I
    don't remember.  He didn't try to pretend he didn't break it.
    It wasn't like anybody tried to cover it up.  It was like,
    "Hey, I broke this window."
            "Okay.  We're fixing it."

Q   Mr. Quezada left his job at Alcoa to work for the City,
    didn't he?

A   That's what he told us.

Q   Did the City run a background check on Mr. Quezada when he
    was hired?

A   Yes.

Q   Did anything show up on it?

27

SUSAN DRIVER

Q  How soon would you expect him to call you back in?

A  Probably within ten minutes.

Q  If he answered the phone while he was driving, would that be cause for termination for you?

A  Yes.  I made that very clear.

Q  Mr. Quezada would work when he wasn't scheduled, wouldn't he?

A  Not that I'm aware of.

Q  Was Mr. Quezada hired knowing he didn't have water certification?

A  Yes.  It was discussed at the interview.

Q  And it was the plan that he would get water certification?

A  Uh-huh.  Yes.

Q  And was there a set time frame in which he needed to get that water certification?

A  Well, the intent he conveyed was that he would do it as soon as possible because it meant a bump in his pay.  So we didn't follow -- that was the intent conveyed at the interview.  So we didn't put a time frame on it because we felt that he was necessarily motivated.

Q  Well, at any time thereafter was he given a time frame?

A  I don't know.  I spoke to his supervisor about it and asked him what was going on.

Q  Isn't that something that you would know as supervisor who was responsible for giving Mr. Quezada evaluations?

A  Yeah.  Yeah, I should have asked.

30

SUSAN DRIVER

Q   Was Mr. Quezada given a pretermination hearing?

A   A pretermination hearing?

Q   Yes.

A   No.   Because he was not terminated.

Q   You testified, though, that you implemented a reorganization instead of terminating him, which had the effect of Mr. Quezada losing his job?

A   Uh-huh.   And a couple of other people.

Q   Was Mr. Quezada ever given an opportunity to confront the allegations against him that led to the reorganization?

A   The allegations against him, if you want to call them that, did not lead to the reorganization.

Q   But you testified that rather than terminate him, you implemented a reorganization?

A   No.   You're getting this backward.   The reorganization was going to happen anyway.   I testified that when the mayor said, "I want to fire him right now," I said "Wait.   Because the job will be eliminated in the reorganization and you won't have to fire him."   The re-org was not about Jose.   It was about the other issue.

Q   You said the reorganization was about finding an employee qualified to replace Mike Herdt?

A   First phase -- the first phase of the reorganization was to bring in someone with water certification.   Because even when Mike was on vacation in California, we were in violation.   We

31

SUSAN DRIVER

Q  Would it surprise you to know that Mr. Quezada was offered
   employment with the City of Entiat, if the position opened
   up, at his deposition?

A  Would it surprise me?

Q  Yes.

A  No.

Q  Why would that not surprise you?

          THE WITNESS:  Jim?

          MR. BAKER:  Do you understand the question?

          THE WITNESS:  I understand the question.

          MR. BAKER:  You want -- why don't you try and
   answer the question.  We've been going an hour.  We'll take a
   break.

          THE WITNESS:  Okay.

A  No, it would not surprise me because the mayor has a history
   of not following through on things that he says he's going to
   do and doing things that he promises the pubic he won't do.

          MR. BAKER:  Let's take a break real quick.

                   (Recess.)

Q  (By Mr. Kane) So how were employees at the City trained to
   get their water certification?

A  I don't know.  Not my division.

Q  Mr. Quezada was scheduled to obtain his water certification
   during the winter because that is the slow season, wasn't he?

A  That was not my understanding, no.  It was -- well, winter or

                              34

SUSAN DRIVER

spring probably.  It was supposed to have started in the spring before the park opened.

Q  What was Mr. Quezada's hire date?

A  March 2nd, I think.

Q  So he was hired during the busy season?

A  No.

Q  When is the busy season?

A  End of May through the end of August.

Q  So do you know whether or not classes -- actual formal classes are involved in obtaining the water certification?

A  I don't think they are for the first phase.  Unless there may be on-line classes, because I know that the first phase could be done in-house.  But that's as far as I know about it.

Q  Going to Exhibit 2, is there a reason you did not have the mayor sign this?

A  This was initially for -- because it's not complete.  That's why I didn't have the mayor sign it.  We didn't get that far.  This would have been combined with Mike's evaluation, and then we would have talked to the mayor.  But we didn't proceed because the evaluation -- because I did -- I did this three -- you'll see the note at the top right corner.  I started my three-month evaluation, as we do for all new employees, and then realized that it was a six-month probationary period.  So I just put this aside because it was not time to do it yet so -- which is why Mike didn't do it,

35

SUSAN DRIVER

because he said six months.

Q It says "Mid Probationary Period" on the front, doesn't it?

A Yes. I wrote that on there after I did it when I realized that it wasn't time yet.

Q So this wasn't a mid probationary period evaluation?

A It was a mid probationary period. It was at the three month mark of a six-month probationary period. That's why it says that.

Q Is there a reason this was never showed to Mr. Quezada?

A Because it wasn't complete.

Q This wasn't actually drafted on June 12th, 2015, was it?

A No. That was the date that I -- that I made this note.

Q When was that drafted?

A Oh, probably a week sooner. Would have been the first week of June.

Q Did you document Mr. Quezada's breakage record?

A I did not, no.

Q You were his supervisor, though?

A No. Mike was his supervisor. And I asked him if he was keeping track of it, and he told me he was. I didn't go and look at it. I just assumed that he told me he was, so he was.

Q So there's a record?

A There should be a record. There's certainly a repair record somewhere.

36

SUSAN DRIVER

REPORTER'S CERTIFICATE

I, ALISON J. SOSA, Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 16th day of February, 2018.

_____
ALISON J. SOSA, CCR
CCR # 2575
Notary Public in and for the
State of Washington, residing
at Wenatchee.

My commission expires on October 31, 2020.
42

# Exhibit
# D





Jose Quezada
PO Box 652
Entiat, WA  98822

February 10, 2015

Mr. Quezada:

Thank you for your interest in the Park Supervisor position at the City of Entiat. After reviewing applicants and completing interviews, we have decided to offer you the position.  Starting wage for this position would be $3000/month additional pay depending on completion of certifications and satisfactory performance during the initial six month probationary period

The City offers retirement through the State of Washington Department of Retirement Services; medical, dental (with orthodontia), vision, and life insurance; paid holidays; 8 hours per month accrual of sick leave and 8 hours per month accrual of vacation time; and a personal holiday. You will be eligible for health insurance benefits after your first full month of employment.

The work hours may vary and will be determined by your immediate supervisor, Mike Herdt, Public Works Director.

Please sign and date below and return this letter to City Hall with the accompanying HR documents if you would like to accept this position offer.

Sincerely,

Keith Vradenburg, Mayor                    Jose Quezeda

Official Start Date: March 2, 2015

P.O. Box 228, 14070 Kinzel Street • Entiat, Washington  98822
Phone: (509) 784-1500 • Fax: (509) 784-1112
Email: city@entiat.org

# Exhibit E

JOSE QUEZADA URIEL OLMOS

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CHELAN

------------------------------------------------------------

JOSE QUEZADA,                          )
                                       )
                  Plaintiff,           )
                                       )
        vs.                            ) No. 16-2-00055-4
                                       )
CITY OF ENTIAT,                        )
                                       )
                  Defendant.           )
                                       )
------------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

JOSE QUEZADA URIEL OLMOS

------------------------------------------------------------


Date:              March 14, 2017

Location:          Lacy Kane, P.S.
                   300 Eastmont Avenue
                   East Wenatchee, Washington  98802


Start Time:        11:08 a.m.
End Time:          12:42 a.m.


REPORTED BY:    CHARLENE M. BECK, CCR, RPR
                CCR # 2543

**1**

APPEARANCES:

For the Plaintiff(s):      MR. COREY M. KANE
                           Lacy Kane, P.S.
                           Attorneys at Law
                           300 Eastmont Avenue
                           P.O. Box 7132
                           East Wenatchee, WA  98802
                           509.884.9541

For the Defendant(s):      MR. JAMES BAKER
                           Jerry J. Moberg & Associates
                           Attorneys at Law
                           124 3rd Avenue S.W.
                           Ephrata, WA  98823
                           509.754.2027

**2**

JOSE QUEZADA URIEL OLMOS

Q   Did you leave on good terms --

A   Absolutely.

Q   -- with the Forest Service?

    You had good performance evaluations for the fires you fought?

A   Yes, sir.

Q   Okay.  When did Alcoa shut down?

A   I believe it was about a year and a half ago now.

Q   Okay.  When you took your job with Entiat, was it known to anyone that it was likely for Alcoa to shut down?

A   No.

Q   Okay.  So when you left Alcoa, as far as you knew that job would have continued to be there?

A   Yes.

Q   And you now know that Alcoa shut down and you would not have had a job there any longer?

A   I wouldn't say I wouldn't have a job.

Q   Okay.

A   Because I could have been relocated.

Q   Well, all the people out at the local Alcoa with jobs like yours lost their jobs; is that right?

A   I wouldn't say all of them, no.

Q   Well, what job did you have?

A   I was a potroom supervisor.

**13**

JOSE QUEZADA URIEL OLMOS

Bellingham?

A   No.

Q   Now, we previously asked you whether you had any treatment from any healthcare professional for like emotional distress or anything.  Have you seen any healthcare provider for emotional distress due to being let go by the City of Entiat?

A   No, I haven't.

Q   And you previously said you haven't taken any medication to help you with problems due to being let go at Entiat.  Is that still true?

A   That's still true.

Q   How much were you earning at the City of Entiat when you left?

A   I believe I was on salary and I believe it was $2,000 a month.

Q   How much were you earning at Alcoa when you left that job?

A   I believe my last year there I was just shy of 90,000. I believe it was 89,000 and some change.

Q   Did that include overtime work?

A   Yes, sir.

Q   What were your hourly wages?

A   I wasn't hourly.  I was salary.

Q   Oh.  What was your salary?

**15**

JOSE QUEZADA URIEL OLMOS

Q    Okay.

A    My last supervisor there, though, was Chamois Pereira. And I can't spell that one.

Q    Chamois?

A    Chamois, yeah.  I can try if you want me to.

Q    Oh, we -- I can do it too.  And do you know if he's still in the area?

A    I don't believe he is, no.

Q    Okay.  Now, in your Complaint you stated at paragraph 2.2 (as read):  "Quezada was discriminated against and discharged by Entiat through the actions of Driver because of his race, Hispanic."

Are you claiming that Susan Driver discriminated against you on the basis of race?

A    Yes.

Q    Okay.  Are you claiming that any other employees of the City of Entiat discriminated against you on the basis of race?

A    You know what?  I feel like in a sense, yes, because they supported her decision.

Q    Okay.  Well, let's go over every person that you claim discriminated against you on the basis of your race. We know Susan Driver.  Who else?

A    My only two supervisors which I consider would have been Mike Herdt and Keith Vradenburg.

17

Q   Okay.  Anybody else?

A   Huh-uh.

Q   Okay.  Tell me why you believe that Mike Herdt discriminated against you on the basis of your race?

A   Because she supported -- he supported her decision.

Q   He supported what decision?

A   Susan's decision to terminate me.

Q   Okay.  Any other reason for you to think that Mike Herdt discriminated against you on the basis of your race?

A   No.

Q   Okay.  How about the mayor?  Why do you say he discriminated against you on the basis of your race?

A   The same reason.  Supported Susan Driver's position.

Q   Okay.  Any other facts to suggest that the mayor discriminated against you on the basis of race?

A   No.

Q   Okay.  Now, what leads you to believe that Susan Driver discriminated against you on the basis of race?

A   She singled me out.  I don't think I got the same treatment other guys did.

Q   Anything else?

A   I just believe she was unfair.

Q   Anything else?

A   Nothing that comes to mind.

**18**

JOSE QUEZADA URIEL OLMOS

Q    Okay.  But you say she accused you of something that was untrue and included not doing your job.  What specifically did she say?

A    I wasn't meeting my duties down at the park.  And my duties, I mean, they're broad.

Q    And who did she tell that to?

A    She actually told that to the park host at the time.

Q    Who else did she tell that to?

A    I don't know.

Q    What was the name of the park host?

A    Steve.  I believe his name was Steve.

Q    Do you have any other information about Susan Driver saying you weren't doing your job?

A    No.

Q    Okay.  And you say that she told you that the mayor was not happy about something?

A    Yes.

Q    Tell me what she told you.

A    She said that she -- that the -- Keith wasn't happy because I was leaving the park without telling anyone, which wasn't true; that I was taking time off, leaving in the middle of my shift and not letting anyone know, and if it happened again I would be fired.

Q    Okay.  Anything else?  Any other examples of the mayor not being happy?

20

JOSE QUEZADA URIEL OLMOS

problems; is that right?

A    Correct.

Q    And then did you specifically ask him whether -- at any other time that "Susan said that you are having problems with me"?  Will you explain that?

A    We had a meeting.

Q    Okay.  When was the meeting?

A    I don't remember the date.

Q    Face-to-face?

A    Yes.

Q    Who all was at the meeting?

A    Michael Herdt, Susan Driver and Keith Vradenburg.

Q    Okay.  The three of you had a meeting.  Where did it take place at?

A    No.  The four of us had a meeting, yeah.

Q    Where did it take place at?

A    City Hall.

Q    Okay.  And was this before or after this phone call with the mayor after the funeral?

A    After.

Q    Okay.  And what was said at this meeting with the four of you?

A    The meeting -- I basically remember the meeting started by Keith telling me that I was doing a very good job and that the Public Works DireCtor had maybe

23

a couple, three years left till he retired and that it was time for them to start grooming me into the new Public Works Director and they were gonna try to get me into some training that winter in our slow season. And it was all positive.

And then it -- when they got done talking about what they were talking about -- I think they were all under the understanding that I was talking about the progress of the park. Well, when that was -- when they were done saying what they had to say I told them the purp-- the point of this meeting is that when I took this job I took this job to try to make a difference in our community, and my thoughts have actually changed, and it's because of the way Susan Driver had been treating me. She's threatened me with my position on several occasions. And I don't have those details fresh off the top of my mi-- on my mind, but I did then. And I told her what those reasons were.

Q Okay. Okay. So at this meeting with the four of you the mayor gave compliments; is that --

A Yes.

Q Okay. Any other situation where the mayor contradicted any suggestion that he wasn't happy with you?

**24**

JOSE QUEZADA URIEL OLMOS

A   No.

Q   So just the two that we've gone over?

A   Yes.   Repeat that question.

Q   Okay.   We've talked about two times in which the mayor expressed -- gave compliments about you; is that right?

A   Uh-huh.

Q   Which contradicted Susan Driver saying that the mayor says you weren't doing a good job?

A   Right.

Q   Any other times other than those two where the mayor complimented you about your work?

A   Oh, I got compliments from him I wouldn't say on a regular basis, but I got compliments from the mayor frequent, I guess.

Q   Okay.   And did you think that that was racial discrimination for him to compliment you?

A   No.

Q   Did you ever get compliments from Mike Herdt?

A   Yes.

Q   And were his compliments an example of racial discrimination?

A   No.

Q   And you said that Susan Driver was -- you didn't get the same treatment as others from Susan Driver and

**25**

JOSE QUEZADA URIEL OLMOS

Q    that she was unfair to you.  And I think you just said that she threatened your job?

A    Yes.

Q    Okay.  Tell me why -- specific reasons why you think that she was unfair to you.

A    Because she threatened me to -- she threatened to fire me for the same reason that -- well, she threatened to fire me because I was using my phone.  Well, that's common practice at the City of Entiat.  Everyone uses their phone.

Q    All right.

A    And no one else got that same threat.

Q    Okay.

A    She threatened to fire me for leaving the park unauthorized.  I was the park supervisor down there, and whenever I left it was pre-arranged.  And she told me that if I ever left the park again without permission she would fire me on the spot.  My reply to her was "I've never left the park without your permission.  If I have a family emergency, I'm gonna leave the park and then explain later."  But that was never the case.

Q    Okay.  So you're saying you never missed any time at the park?

A    I'm not saying that, no.

26

Q    Okay.  What else, if anything, did she do that was
     unfair to you?

A    I can't think of anything off the top of my head.

Q    So what you thought was unfair was her saying that she
     could possibly fire you for using your cell phone and
     she could possibly fire you if you left the park
     without permission?

A    Those are two instances, yes.

Q    Well, are there more?

A    Not that I can think of.

Q    Okay.  What leads you to believe that the unfairness
     that you perceived from Susan Driver was based on
     racial discrimination?

A    Because I was the only Hispanic that was working for
     the City at the time and I was the only one treated
     that way.

Q    Okay.  Any other reason for you to conclude that Susan
     Driver was unfair to you based upon your race?

A    I'm not sure if I understand your question.

Q    Well, okay.  I asked you for facts that would suggest
     that Susan Driver discriminated against you on the
     basis of your race, and you gave an answer.  And I
     want to know:  Are there any other facts that caused
     you to conclude that Susan Driver discriminated
     against you on the basis of race?

27

JOSE QUEZADA URIEL OLMOS

A    Nothing that I can think of.

Q    When you first took the job at Entiat was it your intention to get certified in water and sewer?

A    Yes.

Q    Okay.  What steps did you take while you were employed at Entiat to be certified in water?

A    I worked down at the treatment plant, but there was no opportunity for me to work towards that.  And those were gonna be presented to me that winter, which I never made it to the winter.

Q    Okay.  But did you sign up for any classes that would help you get certified in the water?

A    There were none available.

Q    It's unavailable?

A    They were not available.

Q    Okay.  And how did you determine that?

A    The opportunity was never -- I'm assuming that if there was an opportunity there for me to take a class that would come from my immediate supervisor.

Q    Okay.  What steps, if any, did you take to be certified in sewer?

A    None.  Like I said, we -- there was conversation of me getting certified for those positions and the process was gonna start that winter.

Q    And what would the process be?

**28**

JOSE QUEZADA URIEL OLMOS

A    Some, yes.

Q    And what would he do at the park?

A    Mainly irrigation repairs.

Q    Was he under the Public Works Department?

A    Yes, sir.

Q    Did you ever have any friction with Mr. Mark Abhold?

A    We had our disagreements.

Q    Okay.  What were those about?

A    Sometimes I felt like we could complete a project by the day and he would do what he could to postpone it and finish it tomorrow.  Say, for instance, if we had 20 minutes of work left, there would be an hour left of work, and he'd want to call it a day because he felt like he needed the time to go to the shop and put tools away, which really wasn't necessary.  And I felt like it's 20 more minutes and let's get it done so we can move on to the next one.

Q    Did you ever conclude that Mark Abhold discriminated against you on the basis of race?

A    No.

Q    Okay.  While you worked for the City were you ever subjected to a specific acts of racial discrimination such as racial slurs or other examples of racial animus?

A    I feel like I'm kind of thick-skinned, so I don't take

**39**

things real personal, so...

I mean, there was some stuff said about Mexicans, but, I mean, it wasn't -- it was just in conversation.

Q   Okay.  So you're not suggesting that any employee of the City of Entiat made any racial slurs?

A   Any employee?

Q   Yes, of the City of Entiat.

A   I guess with the exception of what we've discussed about Susan, no.

Q   Well, Susan never used a racial slur, did she?

A   No, I guess not a slur but her actions.

Q   Okay.  Well, did you ever hear any racial slurs from any employees at the City of Entiat?

A   Like I said, someone could take them as racial, but I didn't.  There was comments like "Well, we have a big Mexican family down at the park.  There'll probably be a lot of garbage."  Because they bring a lot of people to their parties.  I didn't take it person, but someone else might.

Q   Okay.  Anything that you took personal?

A   No.

Q   Okay.  Now, when you took your job you took it as a probationary employee?

A   No.

Q   No?

40

A    I don't -- I don't -- I didn't -- I didn't realize that it was actually a probationary job.  I -- I guess I assumed.  It goes without saying that there usually is.  But I was under the understanding that this was gonna be a long-term employ.

Q    Okay.  Well, you signed the City's Personnel Policies; did you not?

A    Did I?  I must have, yes.

Q    Okay.

A    You know something that -- I don't know.  I didn't say anything earlier.  But when I hired on and I went through the interview process I actually wrote a cover letter telling them a little bit about myself and my family and my pers-- past work experience.  And I handed it out to the people that were in that meeting, everyone read it, and Susan made a comment, actually: "You actually wrote this?"  I took it personal like -- almost like she didn't feel like I was competent enough to write a good cover letter.

     And I responded "Well, I" -- "well, actually, I wrote most of it, but I had some help from my wife and a good friend of mine."

Q    So are you --

A    So I took that personal, yes.

Q    Are you suggesting that that's an example of racial

41

JOSE QUEZADA URIEL OLMOS

Q    discrimination by Susan Driver?

A    I felt like it, yes.

Q    Okay.  We better talk about that then.

While you were interviewing for the job Susan Driver asked you whether you actually wrote the cover letter?

A    Yes.

Q    And what else did she say that suggested racial discrimination?

A    Her demeanor.  Questioning -- questioning like, I guess, my capabilities.

Q    Okay.  Well, I need you to explain this in detail if you're suggesting that there's racial discrimination there.

A    Well, someone's sitting across the table with you and they read something and they look at you and they're like "You actually wrote this?", you take it a little personal, yes.

Q    Okay.  What else did she say?

A    That was it.

Q    And what did you answer when she asked you that question?

A    I told her that I actually had help from my wife and a friend.

Q    Okay.  Does that refresh your memory as to any other

**42**

examples of racial discrimination on the part of Susan Driver?

A    Nothing off the top of my head.

Q    So when you took your job at the City was it your understanding it was a permanent job?

A    Yes.

Q    And what was your understanding of how you could be terminated from your position when you took your job?

A    I wasn't told.

Q    Okay.  Well, you weren't a union member?  You didn't have a union contract, right?

A    I was actually -- I left as a salaried employee at Alcoa.  I was at one point in the union, yes.

Q    At the City of Entiat you were not a union employee?

A    Correct.

Q    And do you know what it means by being an at will employee?

A    Not really, no.

Q    Okay.  Well, the employee manual that you signed talks about at will employee?

A    Uh-huh.

Q    Is that right?

A    I'm assuming so.

Q    Okay.  Let me just show you this.  It's titled "City of Entiat Receipt of Personnel Policies".  Is that

43

JOSE QUEZADA URIEL OLMOS

supervisor job.  I bel-- I -- I know it was eliminated when I was terminated, but I'm not sure if there's a new one there.

Q    Okay.  Do you have facts to suggest that your position wasn't eliminated?

A    I don't know.

Q    Okay.  Why did you decide to apply with the City of Entiat while you were still working at Alcoa?

A    I wanted to be part of our community and work closer to home and make a difference.

And, actually, Mike Herdt called me, I believe it was October or November, it was sometime around Thanksgiving, prior to me starting the following -- I think I started there in March, and he told me that they were gonna get funding for a park supervisor.  He asked me if I would be interested.  He felt like I would be a good candidate for that position.  He told me, you know, "You're gonna take a big pay cut, but I'm possibly leaving here in the near future.  You could be -- you could be a candidate for the next Public Works Director.  And the more certifications you get, it'll bump up your pay."  And I believe it was about a hundred dollars per certification I got.

And at the time when I talked to him, like I said, October/November I told him I'd be interested.

45

JOSE QUEZADA URIEL OLMOS

"Keep me in the loop.  If that position becomes available, let me know and I'll go through the" -- "through the process."

And that position became available.  I applied for it, turned in my application, went through the interview process, and they hired me for that job.

Q  Okay.  So you hired on for $2,000 a month with the City of Entiat?

A  Sounds about right, yeah.

Q  Okay.  And you had made approximately $90,000 a year including overtime work at Alcoa?

A  I wouldn't say 90 a year.  I did make about 90 my last year.

Q  By the time you left you were making $90,000 a year, but you decided you wanted to work for Entiat for 2,000 a month?

A  Yes.

Q  So can I conclude from that that you weren't really happy with your job at Alcoa?

A  Oh, I was happy.

MR. KANE:  Object to form.

A  I was happy with my job.

Q  Okay.  You've got a wife and three children and you're willing to go from up to $90,000 a year to a job that pays 24,000 a year; is that right?

**46**

their supervisor?

A   I don't.

Q   Okay.  Do you know of any other employees of the City who used their cell phone while they were driving?

A   Yes.

Q   Okay.  Who is that?

A   Michael Herdt, Public Works Director.  Mike (sic) -- Mike (sic) Abhold.

Q   What?

A   Mark -- Mark Abhold.

Q   Mark Abhold?

A   Yes.  Jerry (sic), honestly, I -- you know, I think we -- we all did at one point or another.

Q   Okay.  Well, I want to know who you know -- specifically know used their cell phone while driving a City vehicle.

A   Dave Har-- Dave Sanford.  The only thing I can think of.

Q   When you worked at the City was it your understanding that absences from your workplace needed to be pre-approved by a supervisor?

A   Yes.

Q   Is it your belief that the City was not allowed to reorganize its workforce to eliminate a position?

A   I'm not sure if I understand the question.

**49**

JOSE QUEZADA URIEL OLMOS

Q  I mean, like did you already own a pickup truck before you started the business?

A  Yes.

Q  Okay.  Do you use that pickup truck in your business?

A  Uh-huh.

Q  You need to say "yes" or "no".

A  Yes.

Q  Okay.  And the equipment you bought for your business, is that equipment listed in your tax returns as to --

A  Uh-huh.

Q  "Yes" or "no"?

A  Yes, sir.

Q  Okay.

        Okay, I think I don't have anything further.  I'll be sending a request for production for some things, tax returns and whatnot.

                MR. KANE:  I had a couple follow-up questions to clarify some of the testimony.


                         EXAMINATION

BY MR. KANE:

Q  Earlier you stated that you submitted a cover sheet with your application?

A  Uh-huh.

Q  And how you presented that to the board -- or

61

JOSE QUEZADA URIEL OLMOS

committee during your interview meeting?

A   Right.

Q   Had you met Susan Driver before that meeting?

A   No.

Q   And could you remind me again what the comment was again that she made about that cover letter?

A   She picked up the cover letter and was reading it. And I'm sitting at the end of the table. And she looked at me and said "You actually wrote this?"

Q   Did you give her any reason to believe that you wouldn't be capable of writing it?

A   I showed up and I shook everyone's hand and sat down and that was it.

Q   Is that a "yes", "no" or --

A   Yes.

Q   -- or --

A   Ask the question again, please.

Q   Did you give her any reason to believe that you wouldn't be capable of writing it?

A   No.

Q   And was using a cell phone while driving a vehicle common for all -- any park employees?

A   Uh-huh.

Q   And was --

A   Yes.

62

JOSE QUEZADA URIEL OLMOS

Q  -- that on park roads or City roads?

A  I don't know that it was ever specified that you couldn't do it.  I mean, that was never an issue, so something that we never -- I don't know that there was a policy or not.

Q  So would the City employees talk on all roads, park roads, City roads?

A  Yes.

Q  And you said that you are thinking about applying to the PUD or the County?

A  No, I didn't say I was thinking about it.

Q  Or you have left that as a possibility?

A  Maybe.  I'm always trying to better myself.  If there was something out there that was worth my while I would consider it, yes.

Q  And you said that that was for the possibility of stable income?

A  Yes.

Q  And would that stable income be similar to the stable income that you had while employed by the City of Entiat?

A  Yes.

Q  So is that what you are seeking again?

A  I'm not sure what I'm seeking at this point, Corey.

Q  Okay.  I don't have any other questions.

**63**

# REPORTER'S CERTIFICATE
## DEPOSITION OF JOSE QUEZADA URIEL OLMOS

I, CHARLENE M. BECK, Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 23rd day of April, 2017.

_____
CHARLENE M. BECK, CCR, RPR
CCR # 2543
Notary Public in and for the
State of Washington, residing
at Wenatchee.

My commission expires on July 19, 2019.

**67**

# Exhibit
# F

COPY

06/12/2015
Mid-probationary period

# CITY OF ENTIAT EMPLOYEE EVALUATION AND GOALS

## EMPLOYEE INFORMATION

Name: _____

Position Title: _____

Department: _____

Supervisor: _____

City Administrator Comments

| JOB PERFORMANCE/SKILLS | MARGINAL | NEEDS IMPROVEMENT | PROFICIENT | COMMENDABLE |
|---|---|---|---|---|
| **Position Knowledge** (Assess employee's grasp of Procedures, methods of operations, and equipment involved on the job.) | ☐ | ☒ | ☐ | ☐ |

*or repair*
Must learn to operate irrigation system

| | | | | |
|---|---|---|---|---|
| **Quality of Work** (Assess the accuracy, content, and thoroughness of work.) | ☐ | ☐ | ☒ | ☐ |

Does a good job making city property look better

| | | | | |
|---|---|---|---|---|
| **Quantity of Work** (Assess degree to which employee meets or exceeds expectations for "normal" production. | ☐ | ☒ | ☐ | ☐ |

Too many distractions

| | | | | |
|---|---|---|---|---|
| **Versatility** (Assess employee's ability to handle new duties and responsibilities or respond quickly and well to changes in procedures or situations.) | ☐ | ☐ | ☐ | ☐ |

No information

| | | | | |
|---|---|---|---|---|
| **Initiative** (Assess degree to which employee is a self-starter, can work with minimum supervision, seeks new and better methods to do job, and contributes new ideas.) | ☒ | ☐ | ☐ | ☐ |

Appears to do only what he is told + no more.

EXH ___ DATE 2/6/18 Susan Driver
WITNESS Susan Driver

City of Entiat Employee Evaluation and Goals Form

March 2015

COPY

|  | MARGINAL | NEEDS IMPROVEMENT | PROFICIENT | COMMENDABLE |
|---|---|---|---|---|

**Cooperation**
(Assess how employee gets along with co-workers, customers, citizens, and other people contacted in the course of work; how willingly employee accepts assignments; and how well the employee reacts to constructive criticism.)

☐     ☒     ☐     ☐

No personal information on this. -Other employees have complained of his unwillingness to do the unpleasant jobs + bad attitude.

**Independent Judgment**
(Assess employee's ability to tackle new problems and situations and arrive at proper solutions with minimum guidance.)

☐     ☐     ☐     ☐

Unknown

**Dependability**
(Assess employee's attendance record and punctuality, whether employee promptly notifies supervisor if out for emergency or illness, amount of time during work hours spent on personal calls or visits.)

☒     ☐     ☐     ☐

Appears to spend an inordinate amount of time on personal phone calls + texts.

**Teamwork**
(Assess employee's ability to work together toward a common goal by communicating, supporting other City staff and officials, promoting a positive outlook, and assisting others as needed.)



☐     ☐     ☐     ☐

Again, no personal knowledge, but other's have quoted him as saying, "I don't have to do that, I'm the supervisor

**Service**
(Assess employee's attitude about being a servant to the public and making the extra effort to serve the people of Entiat.)

☐     ☐     ☐     ☐

Unknown

City of Entiat Employee Evaluation and Goals Form     March 2015

2

COPY

**Training Completed since last evaluation:**

Has not entered into ANY additional training

~~Suggested Goals:~~

Recommendation:
This individual needs further assessment before being taken off of probationary period. Recommend an additional 3 months.

Administrator:
~~Supervisor~~ Comments:

Seems to be highly distracted. Has trouble following directions + understanding City policies. Breakage record for 3 months is unbelievable.

~~Supervisor~~ Signature _____ Date: 06/12/2015

**Employee Comments:**




**Please describe any areas in which you would like to improve:**




Employee Signature _____ Date: _____



Mayor/City Administrator Signature _____ Date: _____

---

**3** | City of Entiat Employee Evaluation and Goals Form                    March 2015

# Exhibit G



Lacy Kane, P.S.
Attn: Scott Kane
300 Eastmont Avenue
East Wenatchee, WA  98802

September 15, 2015


Mr. Kane:

In response to your request for "the written basis for dismissing Jose Quezada from his employment with the City of Entiat," I have enclosed both the staff report on the Public Works reorganization, as well as the memo given to the City staff. The employment offer letter is in the packet from the personnel file.

The pertinent facts are as follows:
1) The Parks Supervisor position (the position Mr. Quezada held) was a new and untested position. This was discussed at the initial interview.
2) The Parks Supervisor position was on a 6 month probationary period, rather than the usual 3 month probationary period, because it was an untested position. The City's personnel policy manual gives the Mayor the authority to extend the probationary employment period from three months to six months at his discretion.
3) The offer letter, accepted and signed by Mr. Quezada, acknowledges the six month probationary period.
4) The City had a vacancy in Public Works, but did not have the funds to hire two, full-time Public Works employees. The choice was made in early 2015 to hire a Park Supervisor because the City was unsure of how much additional work would be required with the opening of the new park.
5) As it turned out, the City left itself open to other problems by not having an additional Public Works staffer with water certification. It became all too clear when the Public Works Director went on vacation and the City had no one to cover.
6) The following is taken from a staff memo to City Council dated August 13, 2015:

P.O. Box 228, 14070 Kinzel Street • Entiat, Washington  98822
Phone: (509) 784-1500 • Fax: (509) 784-1112
Email: city@entiatwa.us

*"In talking with regular staff, it is largely believed that the regular staff could manage the park maintenance like they always did, if they were at the staffing level they had before (four people) if we had a similar Park Host arrangement.  While it is likely that the additional landscaping that will be the City's responsibility next year will require additional help, it is expected that one temporary (May to October) full-time position could cover the overload.*

*We have looked a lot at staffing needs for the park in the past year, and not addressed the general Public Works staffing needs for the entire city. What we are neglecting to see is a huge hole coming up. As of the date of this memo, we have only one person on staff with water certification, the Public Works Director. He also has Level 2 sewer certification. We do have one other person who has Level 1 sewer certification and is working on Level 2, but if anything happened to Mike, we would be in a really bad spot.*

*STAFF CONCLUSION – RECOMMENDATIONS:*
*AS City Administrator, I am proposing that we eliminate the Park Supervisor position at the end of the six month probationary period (effective August 31, 2015). I am also proposing that we close out the temporary staff and Park Host work schedules after the Labor Day holiday (effective September 8, 2015). I further recommend that we advertise for a full-time, year-round maintenance position. Complete water certification should be a requirement to apply for this position so we can fill the gap. A full job description should be prepared and an appropriate budget proposed for the new position, in addition to updating all job descriptions.*

*For park management next year, I recommend bringing back the old Park Host model and staggering all public works staff schedules so that we have coverage on weekends from at least one full-time staff person. The weekends could be split so that no one position needs to cover the entire summer."*

In essence, over the summer it became apparent that the City was inefficiently staffed in Parks, and understaffed in Public Works.  It was recommended that the Parks Supervisor position be eliminated effective August 31, 2015 and that the City start the process of hiring a full time public works maintenance person with water certification.  The Mayor agreed and the council was informed of this proposed change at the August 13, 2015 council meeting.  Consistent with this plan, Mr. Quezada was informed that his position of Parks Supervisor was being eliminated as of August 31, 2015.

P.O. Box 228, 14070 Kinzel Street • Entiat, Washington  98822
Phone: (509) 784-1500 • Fax: (509) 784-1112
Email: city@entiatwa.us

Staff has been working on the job description updates for several weeks, and will be presenting the new position description and all updated job descriptions to City Council in October.

If you have any additional questions, please contact our City Attorney, Steve Smith, at

Johnson, Gaukroger, Smith & Marchant, P.S.
139 S. Worthen Street, Suite 200
Wenatchee, WA  98801

Sincerely,

Susan Driver, City Administrator