SUSAN DRIVER

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF CHELAN

JOSE QUEZADA,                          )
                                       )
                    Plaintiff,         )
                                       )
                         vs.           )   NO. 16-2-00055-4
                                       )
CITY OF ENTIAT,                        )
                                       )
                    Defendant.         )
         -------------------------------------------------

                 DEPOSITION UPON ORAL EXAMINATION

                                OF

                          SUSAN DRIVER

         -------------------------------------------------


         Date:              February 6, 2018

         Location:          Lacy, Kane & Kube
                            300 Eastmont Avenue
                            East Wenatchee, WA




         Start Time:     9:00 a.m.

         End Time:       10:33 a.m.


         Reported By:    Alison J. Sosa, CCR
                         CCR # 2575

SUSAN DRIVER

APPEARANCES:

For the Plaintiff:          MR. COREY M. KANE
                            Lacy, Kane & Kube
                            Attorneys at Law
                            300 Eastmont
                            East Wenatchee, WA   98802
                            (509) 884-9541
                            (509) 884-4805 FAX
                            corey@lacykane.com


For the Defendant:          MR. JAMES E. BAKER
                            Jerry Moberg & Associates
                            124 3rd Avenue, SW
                            PO BOX 130
                            Ephrata, WA   98823
                            (509) 754-2356
                            (509) 754-4202 FAX
                            jbaker@jmlawps.com
                            mklingenberg@jmlawps.com

Also Present:               MR. JOSE QUEZADA

2

SUSAN DRIVER

                              I N D E X

              EXAMINATION                    PAGE

         Mr. Kane                              4

                   I N D E X   O F   E X H I B I T S

                              MARKED          IDENTIFIED

         Number 1                9                9

         Number 2               16               16

3

SUSAN DRIVER

SUSAN DRIVER,                     being first duly sworn
                                 was deposed and
                                 testified as follows:

EXAMINATION

BY MR. KANE:

Q   Could you please state your name for the record and spell
    your last name.

A   Susan M. Driver, D-R-I-V-E-R.

Q   And what is your current address?

A   339 Ninth Street, N.E., D-206, East Wenatchee, Washington.

Q   What is your birth date?

A   March 8, 1965.

Q   My name is Corey Kane.  I'm going to be asking you some
    questions today.

A   Okay.

Q   I'm not trying to trick or mislead you.  I'm just trying to
    get an accurate description of the events that occurred when
    you and Mr. Quezada worked for the City of Entiat.

         If my questions are confusing or you don't understand
    them, you can ask that I rephrase.  As you see, we have a
    court reporter typing down everything we say.  Please try to
    answer in the negative or affirmative saying "yes" or "no."
    Try not to say "uh-uh" or "uh-huh" or shake your head.  I'll
    try to catch you the best I can.  Do you have any questions?

A   No.

Q   And also your attorney may be objecting to some of the

4

SUSAN DRIVER

questions I ask you.  He is just getting his objection on the record.  You still are required to answer.  And you can take a break anytime.  The only rule is if there's a pending question, you are required to answer that question before we take a break.

A  Opinion as opposed to fact?

Q  A pending question.

A  Oh, oh.  Okay.

Q  Sorry.  Have you ever had your deposition taken before?

MR. BAKER:  I want to correct you.  There may be some questions where I object and instruct you not to answer.  So -- and not -- you don't have to answer every question.  Normally you'll answer questions if I object, unless I instruct you not to answer.

THE WITNESS:  Okay.

Q  That would have to do with attorney/client privilege.  So I don't want to know about any discussions you have had specifically with your attorney.

A  Okay.

Q  Have you had your deposition taken before?

A  Nope.

Q  Are you currently employed?

A  Yes.  I work part-time for Wenatchee Valley College and part-time for Wenatchee School District.

Q  What do you do at Wenatchee Valley College?

5

SUSAN DRIVER

A   I am a tutor in the Write Lab.

Q   And what do you do for Wenatchee School District?

A   After-school activities.

Q   How long have you held those positions?

A   I've worked at Wenatchee Valley College since September of 2017 and at Wenatchee School District since December of 2017.

Q   How long did you work for the City of Entiat?

A   Well, I worked for the City of Entiat as a consultant, for a few years as a Planning Director, then again as a consultant, and came back as City Administrator.  So total about eight years, nine -- wait -- eight years.

Q   And when did you stop working for them?

A   October 31st, 2015.

Q   Why did you stop working for them?

A   Harassment.

Q   Harassment on whose part?

A   City officials.

Q   Were harassing you?

A   Uh-huh.

Q   What City officials were harassing you?

A   Planning Commission officials.

Q   What are their names?

A   I'd rather not say.

Q   You are required to answer.

            MR. BAKER:  I don't see how this is reasonably

6

SUSAN DRIVER

calculated to lead to the discovery of admissible evidence at all.  If you can tell me how that would be.

MR. KANE:  Perhaps there's a pattern of harassment or discrimination at the City.

MR. BAKER:  I'll let you go for a while but --

A  Okay.  Specifically Michael Chambers.  He would confront me aggressively at City Council meetings openly and at Planning Commission meetings.  And would try to catch me at City Hall as I was coming or leaving the parking lot.

Q  What would he harass you about?

A  Protecting the mayor.

Q  What did you believe you were protecting the mayor from?

A  Hmm.  He didn't agree with some of the things that the mayor was saying, and I believed the mayor so I supported him.

Q  What was the mayor saying that he didn't agree with?

A  Oh, there were a number of things.  That, for instance, City Council had the final say on what happens with planning and zoning in the city, which is absolutely correct by law.

Mike was upset because the Planning Commission had spent several years working on planning and zoning issues and felt that the City Council didn't respect the effort they had put into it.  The Planning Commission is volunteer, and the City Council are elected officials and it is their responsibility to make those choices.

Q  Was anyone else harassing you?

7

SUSAN DRIVER

A   Not to that extent.

Q   What do you mean by not to that extent?

A   Well, I would get phone calls on the weekends from John Alt asking why I didn't do this or why I didn't do that.  Things that he thought should be happening in the City that weren't part of what I was instructed to do.

Q   What were those things?

A   Changes to the planning codes primarily that are, again, the purview of the City Council by vote because they are elected officials.  As the Planning Director, it was my responsibility to bring those things forth to the City Council, which I did.  He felt, as did Mike Chambers, that I should have been persuading them to vote the way they wanted them to vote, which was not my job.

Q   Were you ever given the option to quit or resign?

A   No.  I did go to the city attorney and to the mayor several times asking them to do something about the harassment.  Nothing was done about it.  So when I ended up in the emergency room with an EKG strapped to me, I quit.

Q   Did any employee of the City ever express to you that they did not agree with how Mr. Quezada was treated?

A   Oh, yeah.  They thought that I was treating him with too much deference and that he was a favorite.

Q   A favorite of yours?

A   Yes.  Yes.  Specifically the Public Works staff thought that

8

SUSAN DRIVER

I was not being fair to them.

Q  And who were the Public Works staff employees that expressed that to you?

A  That would be Mike Abhold and Martin Thacker.

Q  Any other employees?

A  That thought I was treating him differently?

Q  Yes.

A  No.

Q  Did any City employees ever express to you that they did not think you treated him well?

A  Nope.  Completely the opposite that they expressed to me.

(Exhibit No. 1 marked.)

Q  Are you familiar --

MR. BAKER:  Do you have the full letter or just the first page?

MR. KANE:  It looks like I just actually have the first page.  I think it cut off, whoever copied it, the second page.  But I'm not going to go into the -- what's actually in the letter.

Q  (By Mr. Kane) But do you -- are familiar with the document you've just been handed as Exhibit 1?

A  No, I've not seen this before.  Oh, this is his -- oh, yes, I am.  Okay.  I thought this was related to something else, but I just looked at the date.

Q  Who hired Mr. Quezada at the City of Entiat?

9

SUSAN DRIVER

A   Mike Herdt, H-E-R-D-T.

Q   Whose decision was it to hire Mr. Quezada?

A   Keith Vradenburg.

Q   Did you ever interview Mr. Quezada?

A   Yes.  He was interviewed by a panel.

Q   And you read this letter when he was interviewed?

A   Uh-huh.  Yes.  I'm sorry.

Q   You didn't think that Mr. Quezada wrote it, did you?

A   I did not say that, no.  I actually said, "This is a great letter.  Did you write this?"

Q   So you didn't think he --

A   That would not imply that he didn't write it.  I'm a writing instructor so these things are important to me.

Q   So you didn't think he was capable of writing it?

A   That is not what I said.

Q   Well, you asked him if he wrote it?

A   I said "This is a great letter.  Did you write it?"  A lot of people don't write their own cover letters, just like politicians don't write their own speeches.  He then told me that his wife wrote it.  And I said, "It's great that you have that kind of a team."  I don't think that reflects badly on him at all.

Q   You said -- you made the comment, "I want to get rid of that kid"?

A   I made the comment after he was missing for five hours and

10

SUSAN DRIVER

unaccounted for, "I need to fire that kid," yes.

Q  Why did you use the word "kid"?

A  Because I have kids his age.

Q  He's an adult, isn't he?

A  Yes.  Yes, my kids are adults too.  I still call them kids.

Q  Who else was witness to Mr. Quezada, if anyone, being missing for five hours?

A  It was Carol who brought it to my attention, but Pam, Mark, and Martin, and Steve, the park host.

Q  He had a cell phone, didn't he?

A  Yes.  He did not answer his phone.

Q  You tried to call him?

A  That was a common problem.  Yes, I had on several occasions tried to call him, as had Carol and Pam at the front desk. But it was a common problem that he did not answer his cell phone during City work hours.

Q  Did anyone else have problems calling his cell phone?

A  Yes.  Carol and Pam.

Q  Aside from the people you mentioned?

A  I don't know.

Q  Is service -- cell phone service always available in that area where Mr. Quezada would work?

A  I don't know.  I've never had a problem with it in the city of Entiat.

Q  And was there any reason in your answers to discovery that

11

SUSAN DRIVER

you did not mention that Mr. Quezada was missing for five hours?

A  I don't -- I don't think that it was relevant to any of the questions.

Q  Interrogatory No. 17 read, "Did you ever express your desire to terminate or get rid of the Plaintiff to anyone?  If your answer is in the affirmative, please provide the approximate date of that expression and specifically what was said by you and to whom you were speaking."

         MR. BAKER:  Please show the interrogatory to her.

A  I believe when I answered that question, I gave the background before I said that.  Was it not included?  Yeah.  Front desk staff notified me there was a problem.  They couldn't find him.  They had been calling him for hours and he was not answering.  I did respond to that in the interrogatories.

Q  If it was five hours, that fact would be important, wouldn't it?

A  Three hours, five hours, half an hour.  If an employee is missing, an employee is missing.  I don't think it's relevant.  If you're paying someone to be there, they need to be there.

Q  It wasn't Mr. Quezada's specific job to pick up placards, was it?

A  Yes, it was.  That's -- I was informed that it was his job to

12

SUSAN DRIVER

be at City Hall every morning at 8:00 o'clock, pick them up, and take them down to the park host.

Q Who informed you of that?

A The front desk staff who prepared the placards.

Q Mike Abhold picked them up frequently, didn't he?

A Sometimes they called him and had him come and get them, yes, because they hadn't been picked up.

Q Mike Herdt picked them up frequently, didn't he?

A I don't know.  It's possible.  I'm not aware of that.

Q Was it even communicated to Mr. Quezada that that was his specific job?

A I assume it was communicated to him by his supervisor.

Q But you don't know?

A I don't -- I didn't know.  I wasn't following him around every day all day.

Q Is that because you didn't supervise him?

A It's because I supervised the entire City staff, as well as the budget, and worked with the Planning Commission and the City Council.  No supervisor can be everywhere all the time.

Q How closely did you monitor Jose's work?

A About the same as I monitored every employee's work. Typically when concerns were brought to me, they were addressed.

Q How much contact did you have with him on a daily basis?

A I don't think I even saw him every day.  His work was

13

SUSAN DRIVER

primarily outside of the office, except for when he came in

to pick up materials or we had staff meetings.

Q  But you still gave him performance reviews?

A  Uh-huh.  Yes.  Sorry.

Q  Who was Mr. Quezada's direct supervisor?

A  Mike Herdt.

Q  Mike Herdt would have been in a better position to give

Mr. Quezada performance reviews, wouldn't he?

A  He was supposed to do it as well.  Typically before then they

had a City Administrator.  The mayor did performance reviews

for all employees.

Q  Mike Herdt approved of the work that Mr. Quezada was doing,

didn't he?

A  I don't know.  I have heard -- I did hear him complain a few

times, particularly about the breakage issues, and a couple

of times about not knowing where he was.

Q  Mike Herdt would have been in a better position to give

Mr. Quezada a performance review, wouldn't he?

A  I don't think that's relevant because we were both supposed

to do it.  So if Mike didn't do it --

Q  Do you know why Mike didn't do it?

A  Mike didn't do a lot of things Mike was supposed to do, like

supervise his employees.

Q  Is there any reason you did not terminate him for that?

A  I attempted on two occasions to terminate Mike Herdt, but he

14

SUSAN DRIVER

was a deacon at the mayor's church and was, therefore, protected by the mayor.

Q   Did the mayor approve of Mike Herdt's work?

A   That's a matter of semantics.  Did he grumble and complain? Yes.  Was he willing to do anything about it?  No.  He had been confronted by the Public Works staff about Mike harassing them.  He was certainly disturbed by Mike's physical assault on a visitor at the park, at which point I thought Mike should be terminated but -- because he was a liability to the City.  But he was not terminated.  And as I understand, he is still there.

Q   Do you believe Mr. Quezada was a good employee?

A   No.  He was a terrible employee.

Q   But you are now claiming that employees claim that you favored him ever though he was a terrible employee?

A   Because I didn't take action sooner.  There is a memo to the Personnel Committee in my personnel file, which I could get for you if you'd like, that is basically my promise to the City Council Personnel Committee that I will deal with the morale issue that I caused and work with the remaining employees to try to put things back together.

Q   Would it surprise you if you knew that everyone that has provided testimony so far in this case has said Mr. Quezada was a great employee?

A   Given that I know who provided testimony, no.  But if Mike or

15

SUSAN DRIVER

Martin or Pam or Linda had been asked to give testimony, they would have given a different story.

Q   Who do you know that's provided testimony so far in this case?

A   Carol and the mayor.

Q   Who else?

A   Probably Mike Herdt, but I haven't seen any of that.

Q   How long did Mr. Quezada work for the City of Entiat?

A   Six months.

(Exhibit No. 2 marked.)

Q   Are you familiar with the document you've just been handed as Exhibit 2?

A   Uh-huh.  Yes.

Q   Could you describe it for me, please?

A   It is a preliminary evaluation that I did at the halfway point of Mr. Quezada's probationary period.

Q   You didn't like Mr. Quezada, did you?

A   I did like him actually.  I just thought he was not good for the City.

Q   You were looking for a way to get rid of him, weren't you?

A   No.  I was looking for a way to get rid of Mike Herdt.

Q   On the first page where it says "quantity of work," was it you that wrote "too many distractions"?

A   Yes.  I wrote everything on this page.  This was all my handwriting.

16

SUSAN DRIVER

Q  And that all relates to Mr. Quezada?

A  Yes.

Q  How did you see that there were too many distractions for Mr. Quezada when there were days you didn't see him?

A  Related primarily to reports of other people saying he was always on his phone, but that when the City called him, he didn't answer.

Q  Who were those people?

A  Carol, Pam, Mark, Martin, and even a private consultant we brought in to work on a project came in and said, "Who's that new guy?  He's always on the phone."

Q  Who's Carol?

A  Carol is the -- I don't know what she is now.  Deputy Clerk/Treasurer, I think.

Q  What was she then?

A  She was Deputy Clerk/Treasurer.

Q  And what was Pam's position?

A  Assistant Deputy Clerk/Treasurer.

Q  What was Mark's position?

A  Public works maintenance -- I don't know his actual title.

Q  And what was Martin's position?

A  Sewer plant operator.

Q  What was Carol's last name.

A  I don't remember.

Q  Do you remember Pam's last name?

17

SUSAN DRIVER

A  No.

Q  Was one of those individuals in a relationship with either Mark or Martin?

A  Yes.  Pam began dating Mark in January of that year.  Yeah.

Q  And so was Pam Carol's supervisor?

A  No.

Q  Carol was Pam's supervisor?

A  No.  I was both of their supervisors.

Q  Did you say one of them assisted the other one?

A  Uh-huh.

Q  Who assisted who?

A  Well, they didn't -- the title was Assistant Deputy Clerk/Treasurer.  But there was no supervisory responsibility between the two of them.

Q  Did you work with Carol and Pam on a daily basis?

A  Yes, I did.

Q  Do you work with Martin on a daily basis?

A  No.  He was in the sewer plant most of the time.

Q  So did he work with Mr. Quezada on a daily basis?

A  As far as I know.  Supposed to have been.

Q  How would you describe Martin's relationship with Mark?

A  They worked together just fine.  I don't know that they had a relationship outside of work.

Q  And on Exhibit 2 at the bottom of the page --

A  Uh-huh.

18

SUSAN DRIVER

Q  -- you wrote, "Marginal.  Appears to do only what he is told and no more."

A  Yes.

Q  What did you witness that Mr. Quezada did where he only did what he was told to do and no more?

A  Well, when you're looking for initiative, you're looking for people who will say, "Hey, why don't I do this?"  We were hoping -- and I had this discussion with Mr. Quezada -- that he would train to be covered in water certification, sewer certification.  And because Mike didn't specifically say, "You have to do this," he chose not to do it.  Which means no pay incentive.  It also means no backup for Mike.  My plan initially -- and we had this discussion -- was that Jose would come in and learn all this stuff, and then I could get rid of Mike.  But that didn't happen either so --

Q  Jose came to the City of Entiat and there was an understanding by everyone that he would eventually replace Mike, wasn't it?

A  No, it was not the understanding of everyone.

Q  Was it the understanding of anyone?

A  It was -- it was my hope, but, no, it was not the understanding of anyone that he would replace Mike.

Q  How old was Mike?

A  62, I think.  I don't know.

Q  He was planning on retiring, wasn't he?

19

SUSAN DRIVER

A  He was talking about retiring within a couple of years, wasn't he?

Q  And so you were going to terminate him before he could retire in a couple of years?

A  Yes.  Because he was a liability to the City.

Q  How long had he worked for the City?

A  I don't know.

Q  Mike understood that Jose was hired to replace him, didn't he?

A  That may have been Mike's intention, but it was not voiced publicly.

Q  The mayor understood that Jose was hired to replace Mike, didn't he?

A  No.  If he ever thought that, he certainly didn't tell me that.  I thought that my conversation with Jose was private. I didn't think anybody else knew about that.  That doesn't mean he didn't have private conversations with other people that I don't know about, now that I think of it.

Q  But it had always been the plan at the City of Entiat that Jose would receive additional training, wasn't it?

A  Yes.  And it was available.

Q  So why didn't he receive the training?

A  Choice.  My understanding is he chose not to.

Q  You say "my understanding."  Where did you arrive at that understanding?

20

SUSAN DRIVER

A  That is what Mike told me.

Q  Is the City responsible for paying for that training?

A  It's -- the first section of the training is during work time, yes.  It's not -- there's no cost.  But when there's testing, the City pays for the testing.

Q  Would it surprise you to know that employees of the City thought you were out for Mr. Quezada?

A  Yes, it would surprise me to know that, considering they were telling me something completely different.

Q  If you thought Mr. Quezada was a poor worker, why did you not terminate him?

A  That is all spelled out in my memo to the Council.

Q  I'm asking you now.

A  I did not terminate him because I wanted to give him another chance.  And one thing that's not in the memo to the Council, is that I was that little girl.  I was the little girl whose daddy couldn't keep a job.  I was the little girl who stood in line at the welfare office with her mommy.  You know, I -- I didn't want to go that route because there were little girls involved.

Q  Ultimately that is the route that was taken, though, wasn't it?

A  No.

Q  Eliminating his position had the same effect as termination, didn't it?

21

SUSAN DRIVER

A   No.   Eliminating his position allowed him to apply for unemployment and to Cobra his health insurance benefits, rather than firing him, which would not only put a black mark on his record for his next job application, but would not allow him those benefits.   This is why the other employees were upset with me, because I gave him a free pass.

Q   So eliminating his position, that was, you're testifying today, your way of getting rid of him where you didn't have to terminate him?

A   The mayor was prepared to fire him.   I asked him to wait until we got through the re-org because we were going to eliminate the position and it wouldn't have to happen that way.

Q   So was the reorganization put in place specifically to get rid of Mr. Quezada?

A   No.   It was put in place to bring in someone capable of taking Mike's job.

Q   And that is because you felt that Mr. Quezada was not capable of taking Mike's job?

A   It is because he expressed no interest and motivation in preparing himself for that job.   And Mike had accosted a person in the park, and I understand has done it again since then.   And as a liability to the City, needed to be eliminated quickly.   The City could not fire Mike because we would have been in violation of Department of Ecology

22

SUSAN DRIVER

regulations.  We had nobody else who had water certification and Level 2 sewer certification.  So we were in a bad place.

Q  Mr. Quezada was going to get that certification, wasn't he?

A  Mike had told me that he had chosen not to do so.

Q  Did you ever verify that with Mr. Quezada?

A  No, I did not.

Q  Any reason you didn't verify that?

A  I didn't see any evidence that he was doing it.  There was no paperwork on my desk, so I assumed that any response that I got when I asked Mike was correct.

Q  If you were going to terminate him on that basis, wouldn't it be something that you feel it's important to follow up on?

A  If I was going to terminate who on that basis?

Q  Mr. Quezada.

A  No.  If I was going to terminate him on that basis.  But I didn't terminate him, and that wasn't the reason.

Q  So what was the reason?

A  The reason that we didn't want him working there?

Q  Yes.

A  First of all, the park host position was not working out the way that Mike had proposed that it would work out.  The park host was supposed to be in the park Friday, Saturday, Sunday so the Public Works Director did not have to cover weekends.  That wasn't happening.  We had to hire addition staff to make sure all the coverage was there.  And then there was the

23

SUSAN DRIVER

problem with the absenteeism And the problem with, you know, yelling and cussing at other employees and not being responsive. So there were a number of things that were problematic.

Q Jobs were created as a result of the reorganization, weren't they?

A You know, I left right after that, so I really don't know what they did.

Q Jobs would have been created as a result of your planned reorganization, wouldn't they?

A A job would have been created for -- well, recreated. We would have gone back to the old model that had a Public Works Director and a Field Supervisor, which was Mike Herdt's previous job. And I don't know if they hired a Field Supervisor or not.

Q Did you plan on hiring Mr. Quezada as a Field Supervisor?

A He didn't have the necessary certifications.

Q What certifications are required for a Field Supervisor?

A In this case water certification. It was specified in the memo to the Council. It was specified in the memo to the staff.

Q Did you ever talk to Mr. Quezada and say, "Hey, will you get your water certification?"

A I talked to every one of the Public Works employees early on about getting all the certifications they could. I talked

24

SUSAN DRIVER

with them privately, individually, motivate -- trying to motivate everyone to get certifications.

Q So did you talk to Mr. Quezada and say, "Hey, will you get your water certification?"

A Probably.

Q So you don't know?

A I made a point of talking to every Public Works employee to get certifications.

Q I'm just asking specifically, though, about Mr. Quezada.

A Yes, I believe I did.

Q What was his response?

A That he wanted to do as much as he could.  But that was when he was first hired, then he didn't do anything.  Then that's when I asked Mike about it, who told me that he had chosen not to.

Q How do -- how does one get their water certification?

A There is some in-house work that they have to do.  There's study and, you know, they have all -- they have all the documents in the books in the -- at the treatment plant, as I understand.  I haven't gotten my certification, so -- and I don't intend to.  But there is a great deal of study and testing that has to happen.

Sewer certification is a little bit different because they are required to actually work in the treatment plant for a certain period of time before they can be tested.

25

SUSAN DRIVER

Q On the last page of the Exhibit No. 2 it says, "Seems to be highly distracted.  Has trouble following directions and understanding City policies."

A Uh-huh.

Q Did you witness Mr. Quezada being highly distracted?

A Yes.

Q And what did you witness specifically?

A I actually witnessed him on his cell phone a couple of times when he was out in the field.  And I also witnessed several occasions that he was not responsive when City office staff and Public Works staff called him.  And, um --

Q Do you know who he was talking to when you witnessed him on the phone?

         MR. BAKER:  Excuse me.  You interrupted her.  I don't know if she was done.  It didn't seem that she had finished her sentence.

         MR. KANE:  I thought she was finished.

         MR. BAKER:  Okay.

A I'll stop there.  That's fine.

Q (By Mr. Kane) Do you know who Mr. Quezada was on the phone with when you witnessed him talking?

A I do not.

Q Could it have been City staff?

A Highly unlikely since they told me they couldn't get ahold of him.

26

SUSAN DRIVER

Q  Says, "Breakage record for three months is unbelievable."
What was broken?

A  Oh, my gosh.  Truck window, a lawn mower, riding lawn mower.
I don't know.  I don't have a list with me.

Q  How did the truck window break?

A  I don't know.

Q  How did the riding lawn mower break?

A  I was told it was misused, but I was not there.  I only had
the report from the supervisor.

Q  Who were you told it was misused by?

A  Mike Herdt.

Q  If you don't know how the truck window was broken, how do you
know Mr. Quezada broke it?

A  Well, that was about three years ago.  I knew at the time.  I
don't remember.  He didn't try to pretend he didn't break it.
It wasn't like anybody tried to cover it up.  It was like,
"Hey, I broke this window."
        "Okay.  We're fixing it."

Q  Mr. Quezada left his job at Alcoa to work for the City,
didn't he?

A  That's what he told us.

Q  Did the City run a background check on Mr. Quezada when he
was hired?

A  Yes.

Q  Did anything show up on it?

27

SUSAN DRIVER

A  Reckless driving.

Q  And do you recall how old that occurrence was?

A  No.

Q  Did you make an issue of Mr. Quezada's driving record?

A  No.

Q  You never brought it up?

A  I did bring it up.  I didn't make an issue of it.  I brought it up when he was driving doing something or it was reported to me that he was doing something illegally while driving. And I asked him not to do that, and I told him we were aware of his previous reckless driving charge.

Q  What was he doing that was reported to you?

A  Texting while driving.

Q  Where was he driving while he was allegedly texting?

A  Multiple times.  Mark Abhold told me that he was texting while driving the recycling truck, which is a big truck with a trailer up the Highway 2 to Chelan.  Carol told me that she saw him talking on the cell phone driving up Kinzel Street. Her window overlooks Kinzel Street.  Pam told me that she saw him on the phone while he was driving into the parking lot.

Q  Are you still friends with Carol?

A  I don't have contact with any of those people anymore.

Q  Were you friends with them when you worked at the City?

A  Yeah.

Q  Were you friends with Mark?

28

SUSAN DRIVER

A  Well, friends?  No, no.  We had a working relationship.  But, no, I was not friends with Mark.

Q  Were you friends with Pam?

A  No.  Friendly office relationship.  About as far as it goes.

Q  If the reckless driving issue was old, would you have an issue with it?

A  If it was old would I have an issue with it?

Q  Would you have had an issue with it?

A  No, it was old.  But the point was it was there.  So if something like that happened again, the Courts would look at that and say, "This is a repeat offender."  So, you know, it wasn't wiped from his record.

Q  It was over ten years old, wasn't it?

A  I don't know.

Q  Did you ever attempt to call Mr. Quezada while he was driving?

A  I don't know.  If I was trying to call him, I obviously couldn't see him so I wouldn't know if he was driving.

Q  If you tried to call him when he was driving, would you expect that he answer his phone?

A  I would expect that he pull over and answer his phone like everyone else.

Q  What would you expect him to do if there was not a good place to pull over?

A  Call me back.

29

SUSAN DRIVER

Q How soon would you expect him to call you back in?

A Probably within ten minutes.

Q If he answered the phone while he was driving, would that be cause for termination for you?

A Yes. I made that very clear.

Q Mr. Quezada would work when he wasn't scheduled, wouldn't he?

A Not that I'm aware of.

Q Was Mr. Quezada hired knowing he didn't have water certification?

A Yes. It was discussed at the interview.

Q And it was the plan that he would get water certification?

A Uh-huh. Yes.

Q And was there a set time frame in which he needed to get that water certification?

A Well, the intent he conveyed was that he would do it as soon as possible because it meant a bump in his pay. So we didn't follow -- that was the intent conveyed at the interview. So we didn't put a time frame on it because we felt that he was necessarily motivated.

Q Well, at any time thereafter was he given a time frame?

A I don't know. I spoke to his supervisor about it and asked him what was going on.

Q Isn't that something that you would know as supervisor who was responsible for giving Mr. Quezada evaluations?

A Yeah. Yeah, I should have asked.

30

SUSAN DRIVER

Q   Was Mr. Quezada given a pretermination hearing?

A   A pretermination hearing?

Q   Yes.

A   No.  Because he was not terminated.

Q   You testified, though, that you implemented a reorganization instead of terminating him, which had the effect of Mr. Quezada losing his job?

A   Uh-huh.  And a couple of other people.

Q   Was Mr. Quezada ever given an opportunity to confront the allegations against him that led to the reorganization?

A   The allegations against him, if you want to call them that, did not lead to the reorganization.

Q   But you testified that rather than terminate him, you implemented a reorganization?

A   No.  You're getting this backward.  The reorganization was going to happen anyway.  I testified that when the mayor said, "I want to fire him right now," I said "Wait.  Because the job will be eliminated in the reorganization and you won't have to fire him."  The re-org was not about Jose.  It was about the other issue.

Q   You said the reorganization was about finding an employee qualified to replace Mike Herdt?

A   First phase -- the first phase of the reorganization was to bring in someone with water certification.  Because even when Mike was on vacation in California, we were in violation.  We

31

SUSAN DRIVER

had nobody covering the -- we had nobody on staff who had that certification.  If anything had happened, we would have been in big trouble.

Q  When did -- sorry.  You can go ahead.

A  So the first phase was to bring in somebody with water certification immediately.

Q  When did the mayor first become aware of the reorganization?

A  July of that year.  We discussed it in July.  I didn't have the plan written out for a couple of weeks.  So we discussed it before I wrote it up.

Q  You wrote the plan the same day of the City Council's session approving the plan, didn't you?

A  No.  I probably printed it that day.  But it's not the kind of thing you write in a day.  It took weeks.

Q  The City Council meeting was the first time in which the council members saw the plan, wasn't it?

A  Yes.  Most of them were aware that it was in motion.

Q  Why did the mayor want to terminate Mr. Quezada?

A  He was upset about the absenteeism and the City staff complaining.

Q  Who made the mayor aware that Mr. Quezada was allegedly absent?

A  Everyone.  Everyone complained to the mayor.

Q  Even the individuals that said Mr. Quezada was a great employee?

32

SUSAN DRIVER

A   Carol, Pam, Mike, Martin, and occasionally -- Mark, Martin. Occasionally even Mike.  So if they said he was a great employee after the fact, then they changed their story significantly.  All of them complained to me on a regular basis.

Q   Who is Jim Brooks?

A   He works for the School District.  I think he's like maintenance or something.

Q   Who's Patrick Diem (phonetic)?

A   No idea.

Q   Are you aware who was hired for replacing Mr. Quezada?

A   Oh, was Jim hired?

Q   Are you aware of who was hired to replace Mr. Quezada?

A   Apparently not.  No one was hired to replace Mr. Quezada because the job was eliminated.  There is no park host and no park supervisor, unless they changed back to the old system after I left.

Q   Are you aware of who was hired to take on Mr. Quezada's job duties?

A   No.  It should have been spread between all of the Public Works.  It was supposed to be staggered according to the re-org process.  There shouldn't have been one individual hired to take on that job.  That's not the way it was designed.  But, again, I left in October.  I don't know what they did after I left.

33

SUSAN DRIVER

Q   Would it surprise you to know that Mr. Quezada was offered employment with the City of Entiat, if the position opened up, at his deposition?

A   Would it surprise me?

Q   Yes.

A   No.

Q   Why would that not surprise you?

THE WITNESS:  Jim?

MR. BAKER:  Do you understand the question?

THE WITNESS:  I understand the question.

MR. BAKER:  You want -- why don't you try and answer the question.  We've been going an hour.  We'll take a break.

THE WITNESS:  Okay.

A   No, it would not surprise me because the mayor has a history of not following through on things that he says he's going to do and doing things that he promises the pubic he won't do.

MR. BAKER:  Let's take a break real quick.

(Recess.)

Q   (By Mr. Kane) So how were employees at the City trained to get their water certification?

A   I don't know.  Not my division.

Q   Mr. Quezada was scheduled to obtain his water certification during the winter because that is the slow season, wasn't he?

A   That was not my understanding, no.  It was -- well, winter or

34

SUSAN DRIVER

spring probably.  It was supposed to have started in the spring before the park opened.

Q    What was Mr. Quezada's hire date?

A    March 2nd, I think.

Q    So he was hired during the busy season?

A    No.

Q    When is the busy season?

A    End of May through the end of August.

Q    So do you know whether or not classes -- actual formal classes are involved in obtaining the water certification?

A    I don't think they are for the first phase.  Unless there may be on-line classes, because I know that the first phase could be done in-house.  But that's as far as I know about it.

Q    Going to Exhibit 2, is there a reason you did not have the mayor sign this?

A    This was initially for -- because it's not complete.  That's why I didn't have the mayor sign it.  We didn't get that far.  This would have been combined with Mike's evaluation, and then we would have talked to the mayor.  But we didn't proceed because the evaluation -- because I did -- I did this three -- you'll see the note at the top right corner.  I started my three-month evaluation, as we do for all new employees, and then realized that it was a six-month probationary period.  So I just put this aside because it was not time to do it yet so -- which is why Mike didn't do it,

35

SUSAN DRIVER

because he said six months.

Q  It says "Mid Probationary Period" on the front, doesn't it?

A  Yes.  I wrote that on there after I did it when I realized that it wasn't time yet.

Q  So this wasn't a mid probationary period evaluation?

A  It was a mid probationary period.  It was at the three month mark of a six-month probationary period.  That's why it says that.

Q  Is there a reason this was never showed to Mr. Quezada?

A  Because it wasn't complete.

Q  This wasn't actually drafted on June 12th, 2015, was it?

A  No.  That was the date that I -- that I made this note.

Q  When was that drafted?

A  Oh, probably a week sooner.  Would have been the first week of June.

Q  Did you document Mr. Quezada's breakage record?

A  I did not, no.

Q  You were his supervisor, though?

A  No.  Mike was his supervisor.  And I asked him if he was keeping track of it, and he told me he was.  I didn't go and look at it.  I just assumed that he told me he was, so he was.

Q  So there's a record?

A  There should be a record.  There's certainly a repair record somewhere.

36

SUSAN DRIVER

Q  Mr. Quezada called a special meeting, didn't he?

A  Yes, he did.

Q  Who was present at that meeting?

A  Myself, Mike Herdt, the mayor, and Jose.

Q  The mayor and Mike Herdt provided Jose with positive feedback during that meeting, didn't they?

A  I don't think Mike said much at all.

Q  But the mayor then did?

A  I wouldn't call it positive feedback, no.

Q  What would you call it?

A  The mayor was just there to say, "This is what I heard."  He wants to say something.  He said what he had to say.

Q  Well, they said that they thought he was doing a good job, didn't they?

A  I don't know.  I don't remember them saying that, no.

Q  Jose made everyone aware that he thought you were nit-picking him, didn't he?

A  That's what he said at that meeting.  And my response was that I'm trying to grow him.

Q  He made everyone aware that he thought you were looking for a reason to terminate him, didn't he?

A  Not that I know of.

Q  He made everyone aware that you were going out of your way to try to find issues with his job performance, didn't he?

A  No, that did not come up.

37

SUSAN DRIVER

Q He made you all aware that he believed he was being mistreated by you, didn't he?

A He made us aware that he thought it was unfair that I had twice told him if he repeated this action, he would be terminated.

Q What was the action you were referring to?

A Two different actions. One was driving while using the cell phone. The other was leaving without getting proper approval.

Q Did you ever witness any other City of Entiat employees driving while using their cell phone?

A No, I did not.

Q Are you aware as to whether or not they did?

A It's never been brought to my attention. That doesn't mean they didn't.

Q Did you ever ask if they did?

A Yes.

Q Could you describe the situation where you claim Mr. Quezada left without approval?

A Yes. And it's in a memo that you should have.

Linda Countryman was the Clerk/Treasurer and in charge of payroll. On a Friday she was sitting down to do the payroll for the month, and there was some question about Jose's hours. So -- but there were no -- no forms that had been signed. We have a preapproved form that has to be

38

SUSAN DRIVER

signed by your supervisor if you're going to take time off. She had no form, so she called me in and she said, "I don't know what to do about this." So I attempted to call Jose and could not get him on the phone. So I got in my car and drove around town looking for him and I couldn't find him. And I found Mike Herdt and asked him about the time sheet. And he didn't have a -- he said, "Oh, I don't know. I don't know what's happening there."

He eventually did get ahold of Jose and send him in to talk to us. Because Linda was holding payroll. You can't do payroll for everybody but one employee, unless you just don't pay them until the next payroll. So she was holding up payroll until we had the answer. And he came in to talk to us after Mike sent him in. She asked the questions about the time sheet. Mike then called in the middle of our conversation and said, "Oh, oh, yeah. I forgot. I told him he could have that time off."

And we gave him copies of the necessary form and told him that next time he needs to get pre-approval.

Q He did have pre-approval by Mike, didn't he?

A No. That was the problem. He didn't have the form, which was what held up payroll.

Q Did Mike tell him he was supposed to use the form?

A Yes. And it's in the employee manual. But the first time I asked Mike, he told me that he didn't give him the time off.

39

SUSAN DRIVER

And it wasn't until after he spoke to Jose and sent him in that he called and said, "Oh, I forgot. I did give him the time off." So there's some question about that.

Q  If I'm understanding right, if Jose requested time off from Mike and Mike said it would be okay, if Jose did that again, you were going to terminate him?

A  If -- yeah, for two reasons. One, it was a Friday and the mayor had already said, "If he doesn't work Fridays, he's out of here." His quote; "He's out of here."

       And Mike knew that he was supposed to be there on Fridays. So even if Mike had given him permission to take the day off, it wasn't in writing and it wasn't approved. So, yes, you can be terminated for that, not showing up for your shift without approval.

Q  If it was in writing, who would need to approve the absence?

A  Mike would need to approve it. But the mayor sees all of those forms.

Q  Would it surprise you if the mayor testified at his deposition that he didn't have any issues with Jose's attendance?

A  Would it surprise me? No. Would I believe it? No.

                MR. KANE:  I don't have any other questions.

                MR. BAKER:  No further questions? Okay. I have no questions.

          (Concluded at 10:33 a.m., signature reserved.)
                              40

SUSAN DRIVER

IN RE:                          Quezada vs. City of Entiat

DEPONENT:                       Susan Driver

DATE OF DEPOSITION:             2/6/18

DATE CORRECTION SHEET 3UE:      3/18/18

                            CORRECTION SHEET

PLEASE MAKE ALL CORRECTIONS, CHANGES OR CLARIFICATION TO YOUR TESTIMONY ON THIS SHEET, NOT IN THE TRANSCRIPT ITSELF, SHOWING PAGE AND LINE NUMBER AND THE NATURE OF YOUR CHANGE.  IF THERE ARE NO CHANGES, WRITE "NONE" ACROSS THE PAGE. PLEASE SIGN THIS SHEET AND RETURN BY MAIL OR E-MAIL WITHIN  30 DAYS TO ALISON J. SOSA, CCR, PO BOX 2657, WENATCHEE, WA 98807 OR WVCR@NWI.NET FOR FILING WITH THE ORIGINAL TRANSCRIPT.


        Page_____Line_____Correction & Reason_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____

        _____|_____|_____


                    _____

                    DEPONENT SIGNATURE

                    _____

                    DATED
                      41

SUSAN DRIVER

REPORTER'S CERTIFICATE

I, ALISON J. SOSA, Certified Shorthand Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 16th day of February, 2018.

_____
ALISON J. SOSA, CCR
CCR # 2575
Notary Public in and for the
State of Washington, residing
at Wenatchee.

My commission expires on October 31, 2020.

42